THE STATE OF KANSAS V. CHARLES L. WILSON.

No. 13,737.   (80 Pac. 639.)

SYLLABUS BY THE COURT.

1. STATUTORY CONSTRUCTION—*Statute Prohibiting Combinations Not Repealed by Subsequent Enactment.* Chapter 158 of the Laws of 1891 (Gen. Stat. 1901, §§ 2439-2441), prohibiting combinations to prevent competition among persons engaged in buying or selling live stock, is not superseded by the general antitrust law of 1897 (Laws 1897, ch. 265; Gen. Stat. 1901, §§ 7864-7874), but is still in force. (See *post*, p. 343.)

2. CONTRACTS—*Commissions for Buying and Selling Live Stock —Legislative Restrictions.* The intention of the legislature as to restrictions to be placed upon agreements among persons engaged in buying and selling live stock for others for the control of the commissions to be charged must be determined from the act of 1891, above cited, having specific relation thereto, and not from the general antitrust act of 1897 or from that of 1889 (Laws 1889, ch. 257; Gen. Stat. 1901, §§ 2430-2438).

3. MONOPOLIES—*Dealing in Live Stock—Statute Construed.* The act of 1891 above cited forbids agreements to maintain minimum rates of commission for services in the sale of live stock for others, but contains no such prohibition as to agreements concerning charges to be made for services in purchasing live stock.

4. ——— *Mortgage Given to Secure Purchase-money and Commissions—Validity.* Where a member of an association having for one of its purposes the maintenance of a minimum rate of charges for services in buying or selling live stock for others purchases cattle for another, and in pursuance of a by-law of such association charges a commission for such services at the rate of fifty cents per head, which is included in the amount of a note and mortgage given to such member of such association by the purchaser in payment for such cattle, such mortgage is not on account thereof rendered void by the provisions of any of the statutes above cited.

5. CRIMINAL LAW—*Obtaining Money by False Pretenses—Information.* In a prosecution for obtaining money by false pretenses by selling property encumbered by a mortgage under the representation that it is clear, it is not essential that the information should show whether the mortgagee, described as "the A. J. Gillespie Commission Company," is a corporation or a partnership.

The State v. Wilson.

6. ——— *Same.* In such prosecution an allegation of the information that at the time of the sale the property was encumbered by a mortgage sufficiently charges that the mortgage was unpaid.

7. ——— *Allegations and Proof—Variance.* In such a prosecution the proof of a mortgage given for $13,366.80, the amount stated in the information being $13,336.80, is not a fatal variance.

8. ——— *Same.* In such a prosecution the allegation of the information that the mortgage had been by the mortgagee assigned to, and was owned by, a bank and one Louis Hax is sufficiently sustained by proof that the mortgagee had sold the two notes secured by the mortgage, under a blank indorsement, to a buyer who in turn without further writing sold and delivered them to the bank, and that the bank then sold one of them to Hax.

9. ——— *Draft—Defendant's Title as Trustee Not Conclusively Shown.* In such a prosecution the fact that the draft charged to have been fraudulently obtained by the defendant was made payable to him "for the use of" the person alleged to have been defrauded does not conclusively show that the defendant acquired title to it only as a trustee, but is open to the explanation that the words quoted were intended as a mere memorandum to indicate upon whose account the payment was made.

Appeal from Shawnee district court; Z. T. HAZEN, judge. First opinion filed April 8, 1905. Affirmed. Rehearing granted June 10, 1905. Second opinion filed April 7, 1906. Reversed.

*C. C. Coleman,* attorney-general, *Otis E. Hungate,* county attorney, and *Aaron P. Jetmore,* for The State; *Frank Hagerman,* and *Botsford, Deatherage & Young,* as *amici curiæ.*

*Eugene Hagan, A. F. Williams, A. E. Crane,* and *Hayden & Hayden,* for appellant; *D. R. Hite,* of counsel.

The opinion of the court was delivered by

MASON, J.: Charles L. Wilson appeals from a conviction upon a charge of fraudulently obtaining property by false pretenses. The evidence of the state

tended to show that in October, 1898, Wilson and one George Maris purchased a herd of 402 steers, in payment for which they executed two notes to the A. J. Gillespie Commission Company for the aggregate amount of $13,366.80, secured by a mortgage upon the cattle; that in the following December they sold 397 of these steers to the Elk Grove Land and Cattle Company, under the representation that they were clear of all encumbrance, obtaining in payment a check for $500 and a draft for $10,547; and that the buyer was compelled to lose the cattle or pay the mortgage.

A large number of assignments of error have been made and argued, but the one most urgently presented is based upon a contention of the defendant that the cattle were in fact unencumbered because the mortgage executed by himself and Maris was rendered incapable of enforcement by various provisions of the Kansas statutes known generically as the antitrust laws. This question was raised in the trial court by an offer on the part of the defendant to prove that the A. J. Gillespie Commission Company was a member of a voluntary association known as the Kansas City Live-stock Exchange, composed of persons and corporations engaged in the business of buying and selling live stock for themselves and for others, organized for unlawful purposes, among which was that of fixing and maintaining a minimum charge for commissions for their services in buying and selling cattle for others, such minimum charge being established by a by-law at fifty cents per head; that the cattle here involved were purchased by the Gillespie company for the defendant and Maris, a commission being charged in pursuance of the by-law referred to, amounting to $201, which was included in the sum for which the notes and mortgage were given. The offer was made in greater detail than here shown, and included a tender of a copy of the articles of association, rules and by-laws of the live-stock exchange. It was rejected by the court, and the con-

troversy so far as this matter is concerned turns upon the correctness of that ruling.

Defendant in support of his contention invokes three statutes, enacted in different years—chapter 257 of the Laws of 1889 (Gen. Stat. 1901, §§ 2430-2438), chapter 158 of the Laws of 1891 (Gen. Stat. 1901, §§ 2439-2441), and chapter 265 of the Laws of 1897 (Gen. Stat. 1901, §§ 7864-7874). The first of these forbids certain contracts in restraint of trade. The second is narrow in its scope, and applies only to persons or corporations engaged in buying or selling live stock, who are prohibited by it from entering into any agreement to control the amount to be charged as compensation for services in making sales of live stock for others. The third is very sweeping in its provisions. It defines and denounces five kinds of combinations, which it denominates trusts. The definitions are couched in general terms, but cover almost every conceivable device by which freedom of commerce might be hampered, competition restricted, or the price of commodities controlled. All acts done in pursuance of any of the arrangements interdicted by these various statutes are made misdemeanors. The act of 1897 also contains these provisions:

"Any contract or agreement in violation of any of the provisions of this act shall be absolutely void and not enforceable in any of the courts of this state; and when any civil action shall be commenced in any court of this state it shall be lawful to plead in the defense thereof that . . . the cause of action grows out of any business transaction in violation of this act." (Gen. Stat. 1901, § 7870.)

The argument in behalf of the defendant is that, assuming the truth of the rejected evidence, the Kansas City Live-stock Exchange was an unlawful combination under each of these statutes; that in charging the defendant $201 as a commission for services in buying 402 head of cattle for him the Gillespie company acted under and in pursuance of the unlawful bond which

united the members of the exchange, and thereby was guilty of a public offense; that the mortgage was unenforceable both because $201 of its consideration was on this account illegal and because it was made in violation of the provisions of the statute of 1897, or grew out of a business transaction in violation of that statute.

It may be assumed for the purposes of the case that the live-stock exchange was a trust within the meaning of the law of 1897 by reason of a number of its rules other than those relating to the regulation of commission charges. There are provisions of that law which purport to make such fact alone a complete bar to the enforcement of a contract made in this state by one of its members. Such provisions must be interpreted, however, as applying only to contracts made pursuant to the illegal combination, and in furtherance of its unlawful purposes. (*Barton v. Mulvane*, 59 Kan. 313, 52 Pac. 883; *The State v. Jack*, 69 Kan. 387, 76 Pac. 911.) Whether this mortgage was a contract of that character is the pertinent inquiry in this connection. The mere fact that the Gillespie company was a member of a trust when it bought these cattle for Wilson, paid for them, and took his notes and mortgage for the amount, did not taint the transaction with illegality. The feature of the proceeding of which complaint is made, and which causes the doubt of its validity, is the charge of a commission for services in making such purchase at the rate of fifty cents a head—the minimum rate fixed by the unlawful association. This being true, the mortgage was void only in case an agreement to maintain a minimum rate for such services is held to be one of those forbidden by statute.

There are general expressions in the law of 1897 which, if given a liberal construction, might be held to prohibit such an agreement; for instance, those directed against combinations intended "to create or carry out restrictions in trade or commerce, or aids to commerce," or "to carry out restrictions in the full and

The State v. Wilson.

free pursuit of any business," or "to increase or reduce the price of merchandise, produce, or commodities," or "to prevent competition in the . . . sale or purchase of merchandise, produce, or commodities, or to prevent competition in aid to commerce," or "to fix any standard or figure, whereby its price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state." (Gen. Stat. 1901, § 7864.) The statute being penal, however, requires a strict rather than a free construction. Moreover, its interpretation is affected by another consideration. The act of 1897 is so similar in many respects to that of 1889 as to give plausibility to the suggestion that it was intended to cover the whole of the subject-matter of the earlier statute and entirely to supersede it. (*The State v. Smiley,* 65 Kan. 240, 69 Pac. 199.) On the other hand, the act of 1891 is so specific in its terms, and there is such a lack of any apparent attempt to accomplish its precise purpose by the later enactment, that there is little room for a contention that it has been repealed by implication, and we regard it as still in force. This being decided, the two acts, since they relate to the same general subject, must be construed together, as though parts of the same enactment. (*Wren & Clawson v. Comm'rs of Nemaha Co.,* 24 Kan. 301.) The precise scope of the earlier one is indicated by its title, which is "An act prohibiting combinations to prevent competition among persons engaged in buying or selling live stock," etc. In the later enactment there is no reference to this subject by any terms more definite than those already quoted. In this situation, it is to the specific statute, and not to the general one, that we must look for an expression of the intent of the legislature with regard to the matter of regulating the business of buying and selling cattle upon commission, and the prohibition against the transaction complained of by defendant must be found, if at all, in the statute of

1891, and not in that of 1897.    (*Long v. Culp,* 14 Kan. 412.)

Upon a cursory inspection the act of 1891 may seem abundantly sufficient to stamp as illegal any agreement for the control of the commission to be charged for services either in buying or selling live stock.    A careful reading, however, discloses that while the persons against whom it is directed are described as those engaged in the business of *buying or selling* live stock upon commission, the agreements declared to be illegal are in every instance those relating to the establishment of fixed or minimum charges for services in the *sale,* but not in the *purchase,* of live stock for others. This cannot be deemed the result of a mere error, clerical or otherwise, for the expression occurs no less than four times.    Why the legislature should have made a distinction between agreements relating to commissions for selling and those relating to commissions for buying is not a matter of inquiry here; that it has done so admits of no doubt.    We cannot insert in the law an inhibition against the establishment of minimum charges for services in buying cattle, nor can we ignore the effect of the omission of the legislature so to do.    As the commission charged to the defendant by the Gillespie company was for the purchase of cattle for him, not for their sale, it was not under the ban of the statute and did not invalidate the mortgage.    If the law of 1889 is to be considered still in force the application of its general provisions to the matter here involved must be denied, upon the reasoning already employed with regard to the act of 1897.    It results from these conclusions that the trial court committed no error in rejecting the evidence under consideration.

The matter of defense just discussed was advanced under singular circumstances.    There is no pretense that the defendant informed the Elk Grove company, or that it was otherwise notified, of any claim that the mortgage was void because based upon an unlaw-

The State v. Wilson.

ful consideration, either before the cattle were sold or in time to have enabled the company to raise the question against the holder of the mortgage when the cattle were demanded under it. Selling property under the representation that the title is clear when in fact there is in existence a mortgage against it which is valid except for some latent defect unknown to the purchaser, and in virtue of which the property is successfully replevied from him, may be an offense in law, as it assuredly is in morals. But we have assumed that it was necessary for the state in order to convict in this case to prove the existence of a valid mortgage.

The defendant challenged the sufficiency of the information on the ground that it did not show whether the A. J. Gillespie Commission Company was a corporation or a partnership. Such an omission in laying the ownership of the stolen property in a prosecution for larceny would be fatal. (*The State v. Suppe,* 60 Kan. 566, 57 Pac. 106.) The same degree of particularity is not required, however, in the description of the mortgagee in a case of this kind.

Another objection made was that the information did not state that the mortgage was unpaid. It did allege that at the time of the sale to the Elk Grove company the cattle were encumbered by the mortgage, and this was equivalent to an allegation that the mortgage at that time remained unsatisfied. (*Keyes v. The People,* 197 Ill. 638, 64 N. E. 730.)

The information described the mortgage given by the defendant and Maris to the Gillespie company as one securing an indebtedness of $13,336.80. The proof showed that the mortgage debt was $13,366.80. This is claimed to be a fatal variance. It would not be profitable to review the great number of authorities cited in support of this contention. Whether or not it is possible to distinguish this case from those relied upon by the defendant, it is not necessary to do so. Notwithstanding anything that may have been said to the contrary by courts of eminent respectability, it is so

manifest that the defendant could not by the most remote possibility have been misled by the inaccurate statement of the amount for which the mortgage was given that we have no hesitancy in holding that there is nothing substantial in the objection made.

The information alleged that the mortgage had been by the mortgagee assigned and transferred to, and was then owned by, the Central Savings Bank, of St. Joseph, Mo., and Louis Hax. The evidence was that the mortgagee sold the notes under a blank indorsement, that the buyer sold them to the St. Joseph bank, delivering them without further writing, and that the bank sold one of the notes to Louis Hax, retaining the other. This is also complained of as a variance. Granting that for some purposes the description of the notes as having been assigned to, and as being owned by, the bank and Hax was inapt, this is likewise a matter by which no prejudice could result to the defendant and for which it would be folly to set aside the conviction.

The draft which the defendant (jointly with Maris) was charged with having fraudulently obtained was issued by a bank cashier to the order of John Wilson & Co., and by the payees indorsed to "Maris & Wilson, for the use of Elk Grove Land and Cattle Company." It is urged that because of this restrictive indorsement Maris and Wilson acquired no beneficial title to the draft, but took it only in trust for the Elk Grove company. This might be deemed the effect of the indorsement in the absence of any explanation, but the evidence warrants the conclusion that it was intended to mean simply that the draft, although transferred by John Wilson & Co. direct to Maris and Wilson, was delivered to them on account of the Elk Grove company.

Other assignments of error have been argued with regard to the admission of evidence, the giving and refusing of instructions, and the denying of the motion for a new trial. It is not thought that they require

separate statement or discussion. They have all been examined, and we reach the conclusion that the record is free from material error. The judgment is therefore affirmed.

All the Justices concurring.

---

OPINION ON REHEARING.
No. 13,737.    (84 Pac. 737.)
SYLLABUS BY THE COURT.

1. STATUTORY CONSTRUCTION — *Statute Prohibiting Combinations—Repeal by Implication.* Chapter 158 of the Laws of 1891 (Gen. Stat. 1901, §§ 2439-2441), prohibiting combinations to prevent competition among persons engaged in buying and selling live stock, is superseded by the general antitrust law of 1897 (Laws 1897, ch. 265; Gen. Stat. 1901, §§ 7864-7874), and is no longer in force.

2. MONOPOLIES—*Dealing in Live Stock—Violation of Antitrust Law.* An association of persons and corporations engaged in the business of buying and selling live stock, and practically controlling that business at the place of operation, which has a by-law forbidding its members to buy or sell live stock for others without charging a commission therefor of at least fifty cents a head, is a combination to carry out restrictions in the full and free pursuit of a lawful business, and in virtue of that fact is a trust within the terms of chapter 265 of the Laws of 1897.

3. CONTRACTS—*Commission—Void Because Made in Violation of Law.* The charging of a commission for services in the purchase of live stock for another, by a member of such a trust, in pursuance of the by-law referred to, is an act made a misdemeanor by that statute, and a contract to pay a commission exacted under such circumstances is void because made in violation of law.

4. —— *Illegal Consideration—Case Disapproved.* A note and mortgage given for a consideration, a part of which is unlawful because based upon a transaction made criminal by the statute, are wholly void. The language of the second paragraph of the syllabus in *Rathbone v. Boyd,* 30 Kan. 485, 2 Pac. 664, and of the corresponding portion of the opinion, is disapproved.

5. —— *Consideration in Part Unlawful.* Where two notes secured by a mortgage are given for a consideration in part

unlawful, although the unlawful portion of the consideration is less than either of the notes, both of the notes and the mortgage are wholly void.

6. CRIMINAL LAW—*Obtaining Money by False Pretenses—Defense.* In a prosecution under an information charging the obtaining of money by false pretenses through selling as clear cattle that were in fact mortgaged, it is competent for the defendant to show in defense that the mortgage relied upon by the state, although fair on its face, was void by reason of being based in part upon a consideration made illegal by the antitrust statute.

The opinion of the court was delivered by

MASON, J.: Charles L. Wilson was prosecuted and convicted upon a charge of obtaining money by false pretenses by selling cattle which he represented to be clear of encumbrance when in fact they were covered by a mortgage. At the trial, for the purpose of establishing that the mortgage in question was void, and therefore in law no mortgage at all, he offered to prove that the mortgagee was a member of the Kansas City Livestock Exchange, that this exchange was an unlawful combination under the provisions of various statutes of Kansas known as the antitrust laws, and that the mortgage was given in pursuance of the unlawful purposes of such combination, and was therefore, by the very terms of these acts, illegal and unenforceable. The trial court rejected all evidence bearing upon this matter, and at the original hearing of the defendant's appeal the most serious question presented was whether this ruling was erroneous. Three statutes were invoked by the defendant in this connection, namely: Chapter 257 of the Laws of 1889 (Gen. Stat. 1901, §§ 2430-2438), which forbids divers enumerated agreements in restraint of trade; chapter 158 of the Laws of 1891 (Gen. Stat. 1901, §§ 2439-2441), which relates specifically to combinations of persons engaged in buying or selling live stock; and chapter 265 of the Laws of 1897 (Gen. Stat. 1901, §§ 7864-7874), which denominates associations for various purposes as

trusts, makes them unlawful, and provides direct and indirect penalties for the doing by their members of the prohibited acts.

This court upon first consideration was of the opinion that the statutes of 1891 and 1897 should be construed together. Under such construction it was held that the validity of the mortgage must be tested by the provisions of the act of 1891, because of their more specific reference to transactions of the character of that involved, and that as so tested it was not void. This view involved deciding in the negative a question which in the course of the discussion had been suggested by the state, but had not been fully argued upon either side, namely, whether the statute of 1897 was intended to cover the whole subject-matter of the act of 1891, and therefore to supersede it entirely. By reason of a very serious doubt of the correctness of the first impression of the court in this respect a rehearing was granted, and upon further consideration in the light of a full presentation of the matter the unanimous conclusion is reached that the later enactment was designed as a complete substitute for the earlier one.

The legislation of 1891 was entitled "An act prohibiting combinations to prevent competition among persons engaged in buying or selling live stock," etc. It forbade any agreement among such persons having the purpose or effect to prevent competition in the business of selling live stock for others, or to fix a minimum commission for such services. The act of 1897 makes no specific reference to agreements concerning commissions for the purchase or sale of live stock, and in the opinion announcing the decision of the case in this court it was said that the mere general expressions of the later act did not evince a purpose to replace the more definite provisions of the earlier one. However, the first subdivision of section 1 of the act of 1897 (Gen. Stat. 1901, § 7864) makes unlawful any combination "to create or carry out restrictions in trade or

commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state," and our final conclusion is that, whether or not any other provisions of this act should be construed as having that purpose, the portion quoted was intended to reach among other evils the very one denounced by the statute of 1891, for an agreement between persons engaged in buying and selling live stock for others that a minimum commission for their services shall be maintained is of necessity a restriction in commerce and in the full and free pursuit of a lawful business. Upon this ground we hold that the law of 1897 leaves no field for the operation of that of 1891, and therefore becomes a substitute for it and effects its repeal by implication.

This view is supported by two additional considerations: The act of 1897 presents a plan of handling the whole subject of trusts, and it is difficult to fit into it the provisions of the act of 1891 without marring its completeness and recognizing distinctions between essentially similar matters, such as we cannot believe the legislature intended; and, while there is no repealing clause in the law of 1897, section 11 (Gen. Stat. 1901, § 7874) provides that the act of which it is a part shall not be construed to affect any action pending under any earlier law. This saving clause, which expressly retains the vitality of the former statutes so far as concerns proceedings already begun under them, fairly implies that they are to have no further force, but are to be regarded as repealed except to the extent indicated.

The view that the law of 1897 is complete in itself, and does not require to be interpreted in connection with that of 1891, reopens the entire question whether the defendant should have been permitted to give in evidence the circumstances under which the mortgage referred to was made. He offered, among other things, to prove that it was given to a member of the Kansas City Live-stock Exchange; that this exchange was an

The State v. Wilson.

association of persons engaged in buying and selling live stock for others, and practically controlling that business at Kansas City; that a by-law of such association forbade its members to charge a less commission for such services than fifty cents a head; that a part of the consideration of the two notes to secure which the mortgage was given was a charge of $201 for the services of the mortgagee in purchasing for the mortgagor the 402 head of cattle covered by the mortgage; that this commission was fixed and exacted in pursuance of the by-law already mentioned. Would these facts, if proved, render the mortgage void? It follows from what has already been said that they would show that the Kansas City Live-stock Exchange was a trust within the terms of the statute of 1897. Section 1 of that statute reads:

"A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes:

"*First,* To create or carry out restrictions in trade or commerce or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

"*Second,* To increase or reduce the price of merchandise, produce or commodities, or to control the cost' or rates of insurance.

"*Third,* To prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or to prevent competition in aids to commerce.

"*Fourth,* To fix any standard or figure, whereby its price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state.

"*Fifth,* To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which they shall bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure or by which they shall agree

in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure, or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others, to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity, or by which they shall agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that its price may in any manner be affected.

"And any such combinations are hereby declared to be against public policy, unlawful and void." (Laws 1897, ch. 265, § 1; Gen. Stat. 1901, § 7864.)

It is needless to determine in this connection the effect of any of the subdivisions of the section except the first, for that is sufficient for the present purpose. The business of buying and selling cattle is one permitted by the laws of this state. An agreement among the members of an association which practically controls this business at a great commercial center that they will make no purchases or sales for others without charging as a commission for their services at least fifty cents for each head of cattle handled obviously creates a restriction in the full and free pursuit of that business. It also seemingly creates a restriction in commerce, although *Hopkins v. United States,* 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, and *Anderson v. United States,* 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300, are cited as holding against this. These cases, however, merely decide that agreements such as that referred to are not in direct restraint of interstate commerce, as such.

Was the mortgage void if it was made to a member of a trust under the circumstances claimed by the defendant? The question is rendered one of great importance by reason of the possible far-reaching consequences of an affirmative answer. It, together with related questions, has been argued at length, not only by counsel for the parties to this action but also by

attorneys appearing as *amici curiæ,* presumably in behalf of clients whose interests may be affected by the conclusion reached.    Since the motion for a rehearing was granted requests for extensions of time for presentation of the matter have been repeatedly granted, in order that the fullest opportunity for discussion might be given.    The parts of the statute especially relied upon by the defendant in this connection read:

"Sec. 5.    Every person, company or corporation within or without this state, their officers, agents, representatives or consignees, violating any of the provisions of this act, within this state, are hereby denied the right, and are hereby prohibited from doing any business within this state.    . . .

"Sec. 6.    Each and every person, company or corporation, their officers, agents, representatives or consignees, who, either directly or indirectly, violate any of the provisions of this act shall be deemed guilty of a misdemeanor and on conviction thereof shall be subject to a fine of not less than one hundred dollars nor more than one thousand dollars, and shall be imprisoned not less than thirty days nor more than six months.    . . .

"Sec. 7.    Any contract or agreement in violation of any of the provisions of this act shall be absolutely void and not enforceable in any of the courts of this state, and when any civil action shall be commenced in any court of this state, it shall be lawful to plead in the defense thereof that the plaintiff or any other person interested in the prosecution of the case is at the time or has within one year next preceding the date of the commencement of any such action been guilty, either as principal, agent, representative, or consignee, directly or indirectly, of a violation of any of the provisions of this act, or that the cause of action grows out of any business transaction in violation of this act." (Laws 1897, ch. 265; Gen. Stat. 1901, §§ 7868-7870.)

They who contend that the mortgage in question would be valid notwithstanding this statute, although executed under the circumstances stated by the defendant, rely upon the cases of *Barton v. Mulvane,* 59 Kan. 313, 52 Pac. 883, *Ice Co. v. Wylie,* 65 Kan. 104, 68 Pac. 1086, and *The State v. Jack,* 69 Kan. 387, 76 Pac. 911.

These cases, however, proceed upon the theory that a wrong-doer is not to be deprived of his right to maintain an action in court merely because he has violated the law in some matter having no relation to the subject of the litigation. This principle forbids the enforcement of the literal terms of the section last quoted, but leaves an abundant field for their operation as reasonably construed. As was said in the case last cited:

"The provisions of section 7 [Gen. Stat. 1901, § 7870] that in any civil action there may be pleaded in defense that the plaintiff, or any person interested in the prosecution, has within one year been guilty of a violation of any of the provisions of the act, as held in *Barton v. Mulvane,* 59 Kan. 313, 52 Pac. 883, under a very similar provision of the antitrust act of 1889 (Laws 1889, ch. 257), contemplates only civil actions relating to, and growing out of, transactions prohibited by the act. It was not intended by the legislature to deprive the litigant of the right to resort to the courts for the protection of property rights and interests not connected with such combinations or trusts. Thus interpreted, the provision is a valid exercise of legislative power, and is not open to the charge of appellant that it constitutes outlawry." (Page 399.)

The contention here made is that the mortgage was void, not because it was given to one who was a member of an unlawful combination, but because a part of its consideration—the charge made for commission— was itself illegal. This is not an instance of an attempt to fasten a disability to sue upon an individual because of his violation of the law in some independent or collateral matter; the objection goes to the contract itself. The statute forbids a member of a trust to do any business in the state—that is to say, as properly interpreted, to do any business in promotion of, or in pursuance of, the purposes of the trust. Assuming the facts to be as alleged by the defendant, the mortgagee, a member of the trust, bought these cattle for him, and in pursuance of the obnoxious by-law made him a charge of fifty cents a head for such service. This was an illegal act, and the contract to pay such

commission was a contract to pay a sum exacted in
defiance of the law.   The contract for this payment
was, therefore, a contract in violation of the statute,
by the very terms of which such contracts are made
not merely non-enforceable, but absolutely void.   (9
Cyc. 475.)

A part of the consideration of the mortgage was
therefore illegal, if the facts were as the defendant at-
tempted to show.   Would this render the mortgage it-
self void?   The generally accepted rule is that if any
part of a single consideration or either of two separate
considerations of a contract is illegal the entire contract
is void, although where two promises, one of which is
illegal, are made upon a lawful consideration, the
promise which is unobjectionable is ordinarily held to
be enforceable.   (See 9 Cyc. 564-566, where the cases
bearing upon the matter are collected and classified by
states.)   It is true that there are cases arising upon
contracts based in part upon a legal, and in part upon
an illegal, consideration where the courts have per-
mitted an enforcement to the extent of the good con-
sideration.   But for the most part such cases purport
to follow the general rule as above stated, but reach
a result at variance therewith by failing to distinguish
between a consideration which is merely insufficient
to support a promise and one which is actually against
the law or contrary to good morals.   Where one of two
considerations, or a distinct part of one consideration,
is for any reason not capable of sustaining a contract,
but is not otherwise obnoxious to the law, the courts
universally recognize the situation as a partial failure
of consideration and permit a *pro tanto* recovery.   But
where one of two considerations, or a distinct part of
one consideration, is unlawful, as being forbidden
either by the statute or by the common law, the pre-
vailing view is that the partial illegality taints the en-
tire transaction, and the contract itself is void.   Ac-
cording to the great weight of authority, and as we
think also according to the better reason, this doctrine

is applicable where a note or series of notes is given
for a consideration a specific and ascertained amount
of which is illegal—for example, for an indebtedness
composed of various items, some lawful and some un-
lawful. A typical and often-cited case is that of *Widoe
v. Webb,* 20 Ohio St. 431, 5 Am. Rep. 664, where an ac-
tion was brought upon a note given in settlement of
an account which included various separate charges
made for intoxicating liquor sold in violation of law.
In the opinion it was said:

"The concurrent doctrine of the text-books on the
law of contracts is that if one of two considerations of
a promise be *void* merely, the other will support the
promise; but that if one of two considerations be *un-
lawful,* the promise is void. When, however, for a legal
consideration, a party undertakes to do one or more
acts, and some of them are unlawful, the contract is
good for so much as is lawful, and void for the residue.
Whenever the unlawful part of the contract can be
separated from the rest it will be rejected, and the re-
mainder established. But this cannot be done when
one of two or more considerations is unlawful, whether
the promise be to do one lawful act, or two or more
acts, part of which are unlawful; because the *whole
consideration* is the basis of the *whole promise.* The
parts are inseparable. [Citing text-writers.] Whilst
a partial *want* or *failure* of consideration avoids a bill
or note only *pro tanto, illegality* in respect to a part of
the consideration avoids it *in toto.* The reason of this
distinction is said to be founded, partly at least, on
grounds of public policy, and partly on the technical
notion that the security is entire, and cannot be appor-
tioned; and it has been said with much force that,
where parties have woven a web of fraud or wrong, it
is no part of the duty of courts of justice to unravel the
threads and separate the sound from the unsound.
. . . The suit was upon a promissory note alone—
upon a single and entire promise. This note was given
in settlement of an account embracing transactions be-
tween the parties for a period of eighteen months.
The evidence tended to show that whilst some of these
transactions were proper and legal, yet many of the
items of the account were for intoxicating liquors sold
by the plaintiff to the defendant in direct violation of

the provisions of a highly penal statute. The contract evidenced by the note was illegal and void, because these sales of liquors, which formed a part of its consideration, were clearly illegal.

"With respect to the items of the plaintiff's account which were unconnected with the illegal sales, he might well have maintained an action on the original contracts of sale, even after the giving of this note, for, being utterly void, it discharged none of the just indebtedness of the defendant. But he chose to sue upon the note which was *prima facie* evidence of indebtedness to the extent of the whole sum promised to be paid, and thus attempted to throw upon the defendant the burden of showing how much of it was given upon an illegal consideration, and upon the court the task of separating the sound from the unsound. If this effort should result in his losing what was justly due him, we can but repeat what was said in a similar case: 'It is but a reasonable punishment for including with his just due that which he had no right to take.'" (Pages 435, 437.)

So in the case of *Wadsworth v. Dunnam*, 117 Ala. 661, 23 South. 669:

"The doctrine of the common law, as it is laid down in the text-books, and supported by numerous adjudications, is that 'if any part of the entire consideration for a promise, or any part of an entire promise, is illegal, whether by statute or at common law, the whole contract is void. Indeed, the courts go far in refusing to found any rights upon wrong-doing.' [Citing authorities.] . . . There has not, perhaps, been more frequent application of the doctrine than to promissory notes, or other evidences of debt, taken in settlement of accounts for goods, wares, or merchandise, items of which were for goods sold on Sunday, or for spirituous liquors sold in violation of law. The accounts may have contained items having no connection with the illegal sales; items for goods not sold on Sunday, or items for the sales of goods not prohibited. When all are blended, and a promissory note is taken for the whole, the note is entire and indivisible, and upon it there can be no recovery. . . . The complaint declares on eight several promissory notes, and the uncontroverted fact is that these notes were given in settlement of an account for goods and merchandise

sold by the plaintiffs to the defendant. And there was evidence tending to show that some of the sales were made on Sunday, and some were of ginseng cordial, an intoxicating drink, in ·violation of a law prevailing in the locality of the sale, ·rendering such sale an indictable offense. If there were items of the account closed by the notes not tainted with illegality—unconnected with the illegal sale—the plaintiffs could have maintained an action on the original contracts of sale, though the notes had been taken. The notes, if tainted with illegality, are utterly void; incapable of discharging the just indebtedness of the defendant." (Page 670.)

To the same effect are: *Hanauer v. Doane,* 79 U. S. 342, 20 L. Ed. 439; *Douthart v. Congdon,* 197 Ill. 349, 64 N. E. 348; *Bick v. Seal,* 45 Mo. App. 475; *Cotten v. McKenzie,* 57 Miss. 418; *Carleton v. Woods,* 28 N. H. 290; *Snyder v. Willey,* 33 Mich. 483; *Deering v. Chapman,* 22 Me. 488, 39 Am. Dec. 592. This application of the doctrine is almost universally upheld by the text-writers. For instance, in volume 1 of Daniel on Negotiable Instruments, fifth edition, section 204, the author says:

"When the defense is founded on illegality of consideration it is to be distinguished from a defense on the ground of a want or failure in the consideration by this peculiarity—that a partial illegality vitiates the bill or note *in toto,* while the partial want or failure of consideration only vitiates it *pro tanto.* And a mortgage to secure a bill or note of which the consideration is in part illegal is also wholly void. The reason of the distinction ·is based mainly upon the ground of public policy, the court not undertaking to unravel a web of fraud for the benefit of the party who ,has woven it. If, however, the legal portion of the consideration were distinctly severable, the party could still recover by the proper action to its proportionate extent, though not upon the bill or note."

(See, also, 1 Parsons, Cont., 9th ed., 456; Chitty, Cont., 10th Am. ed., 730; Jones, Chat. Mort., 4th ed., § 350; Pollock's Prin. of Cont., 1st Am. ed., 318; Anson, Cont., 2d Am. ed., 252; 1 Edwards, Bills, Notes & Neg.

Inst., 3d ed., § 471; Bishop, Cont. § 74; 2 Beach, Modern Law of Cont. § 1422; Benj. Prin. of Cont. 27; Comyn, Cont., 3d Am. ed., 20; Metcalf, Cont. 247; MacLaren, Bills, Notes & Cheques, 2d ed., 185; Story, Prom. Notes, 5th ed., § 190; Wood's Byles, Bills & Notes, 146; 1 Story, Cont., 5th ed., § 583; 1 Page, Cont. 777; Lawson, Cont., 2d ed., § 335; 2 Addison, Cont., 8th ed., with American notes, 1169, note; Clark, Cont. 471; 4 A. & E. Encycl. of L. 192; 17 A. & E. Encycl. of L. 308.)

The second paragraph of the syllabus in *Rathbone v. Boyd,* 30 Kan. 485, 2 Pac. 664, seemingly does not accord with the general rule already stated. It reads:

"Where a chattel mortgage is made to secure, in part, a valid debt, and, in part, money advanced upon an illegal contract, the chattel mortgage may be enforced to the extent of the valid debt, although void as to the residue."

This portion of the syllabus and the corresponding part of the opinion may not have been essential to the determination of the case, but whether this be so or not we cannot accept the view there expressed as controlling upon the matter now under consideration, for the reason that it was announced without discussion and seemingly without examination of the consequences attached by the courts to a partial illegality of consideration, as distinguished from mere insufficiency. In a later case, *Fleming v. Greene,* 48 Kan. 646, 30 Pac. 11, while the precise point was not directly involved, the court quoted with approval a statement of the general doctrine taken from *Widoe v. Webb,* 20 Ohio St. 431, 5 Am. Rep. 664, which is included in the quotation already made from that case. (See, also, *Gerlach v. Skinner,* 34 Kan. 86, 8 Pac. 257, 55 Am. Rep. 240; *Stansfield v. Kunz,* 62 Kan. 797, 64 Pac. 614.)

There are cases holding that where a mortgage is given to secure two separate debts, one only of which is unlawful, the mortgage may be enforced to the extent of the valid indebtedness. In *Shaw v. Carpenter,*

54 Vt. 155, 41 Am. Rep. 837, although the court professed to approve and follow *Carleton v. Woods*, 28 N. H. 290, a mortgage given to secure several notes a part of the consideration of which was illegal was permitted to be enforced to the extent of the valid consideration, upon the theory that equity was thereby done. In a dissenting opinion these cases were reviewed, and it was pointed out that even if a mortgage securing two notes, one good and one unlawful, may have vitality as to the valid note, yet where the notes themselves are void because tainted with an illegal consideration the mortgage can have no efficacy whatever. The distinction is obviously sound, and even though the correctness of the conclusion in *Rathbone v. Boyd*, 30 Kan. 485, 2 Pac. 664, were conceded it would not give force to the mortgage in the present case, for the two notes secured by it are equally affected by the illegality of consideration, and if the notes are void the mortgage is necessarily so.

The supreme court of Indiana, in *Hynds v. Hays*, 25 Ind. 31, repudiated the generally accepted doctrine in an opinion which presents a plausible and complete argument in favor of the position taken, based upon the view that a note given for two distinct considerations is to be treated as a severable contract. We cannot, however, regard it as affording sufficient ground for departing from a rule so reasonable in itself and so firmly entrenched in the authorities.

The case of *Carradine v. Wilson*, 61 Miss. 573, is one which supports the validity of the mortgage, but upon a different theory. It was there held that where two notes were given for a consideration a part of which was illegal, each note being for a greater amount than the illegal portion of the consideration, and a mortgage was given securing both notes, the unlawful consideration could be referred to one of the notes, rendering it void, but thereby purging the other note of the illegality and leaving the mortgage as a valid security for the second note. The facts of the present case are sub-

stantially the same. The illegal consideration was but $201. Two notes were given, respectively for $6000 and $7366.80. We cannot agree, however, that there is any doctrine of law or reason that would justify considering the commission charge as having entered as an entirety into one note and none of it as having been incorporated in the other. There was in fact but one transaction. The Mississippi court bases its view largely upon *Zundt v. Roberts,* 5 S. & R. (Pa.) 139, and *Warren v. Chapman,* 105 Mass. 87. The former case is at variance with the prevailing view, and has done much to promote such conflict as there is in the decisions. The latter holds that where one owes two debts, one legal and one illegal, and gives his creditor a note for an amount less than the valid part of his obligation, with no express direction as to its application, the law will apply it to the good and not to the bad account, and treat it as supported by a valid consideration. This is an entirely reasonable proposition, but it has no tendency to support the conclusion reached in *Carradine v. Wilson,* 61 Miss. 573. It results from what has been said that the view of this court is that upon the facts as the defendant sought to develop them the mortgage given by him was void.

Some attack has been made upon the constitutionality of the antitrust statute of 1897, but we think the questions so suggested are set at rest by the decisions of this court and of the federal supreme court. (*The State v. Smiley,* 65 Kan. 240, 69 Pac. 199, 67 L. R. A. 903; *Smiley v. Kansas,* 196 U. S. 447, 25 Sup. Ct. 289, 49 L. Ed. 546.)

Was it competent for the defendant to show that the mortgage was in fact void for the reason suggested, although the invalidity did not appear on the face of the instrument? The notes were non-negotiable, so that the question is not affected by any considerations of the possible rights of an innocent purchaser. There was evidence that the complaining witness, who bought the cattle from the defendant, was required to pay the

mortgage, not being advised of any fault in its origin. There is an obvious incongruity under the circumstances in permitting the defendant to escape punishment by showing that his representations that the cattle were clear were in fact true because the mortgage upon them was void under the antitrust law, although fair and legal on its face. The wrong and fraud practiced upon the complainant are not mitigated by the existence of this concealed defense to the mortgage. Yet the criminal law can only be administered in accordance with fixed and unyielding rules. And no principle of criminal law is better settled than that in order to sustain a prosecution for obtaining property by false pretenses the pretenses must be shown to have been false. It is not enough even that the defendant believed them to be false; there can be no conviction unless they were false in fact. (19 Cyc. 394.) The allegation in an information that a defendant obtained money by false pretenses through the sale of property represented to be clear when in fact there was a mortgage upon it can only be responded to by proof of the existence of a valid mortgage. (*Satchell v. The State,* 1 Tex. App. 438; *State v. Asher,* 50 Ark. 427, 8 S. W. 177; *State v. Garris,* 98 N. C. 733, 4 S. E. 633; *Keller v. The State,* 51 Ind. 111.) If, for instance, the mortgage had been paid, there is no doubt that the establishment of this fact would require an acquittal, although the notes and mortgage were outstanding, uncanceled and unreleased, and although the purchaser might have been inconvenienced thereby.

The information in this case charged in set terms that the mortgage in question constituted a valid lien on the cattle. But even in the absence of an express averment of its validity the mortgage referred to must have been understood to be a valid and not a void one. It is possible that if this defense had been anticipated a good information might have been framed by charging the defendant with selling cattle under the representation that he had signed no instrument purporting

to encumber them by which a colorable claim of lien upon them might be asserted, whereas in truth he had executed what appeared to be a good mortgage upon them, which fact caused them to be less valuable to the purchaser than they would otherwise have been, and that by reason of this apparent lien the purchaser, not being advised of any defect in the mortgage, was required to pay the amount or lose the cattle. Under such allegations a conviction might perhaps have been sustained irrespective of the legal sufficiency of the mortgage.

The judgment of conviction is reversed, and a new trial ordered.

All the Justices concurring.