William O'Briant, plaintiff, instituted this suit in the district court of Taylor county, Texas, to recover on two promissory notes, each in the sum of $1,625, executed by R. O. Anderson, defendant, and payable to the order of plaintiff, O'Briant. The defendant, Anderson, pleaded that the notes were without consideration, and that they constituted a part of a fraudulent transaction, in itself against public policy, for which reason the plaintiff, O'Briant, ought *Page 843 
not to recover. The case was submitted to a jury, and upon the verdict a judgment was entered by the court in favor of the plaintiff. Motion for new trial was overruled, and the case is properly before this court.
Under the assignments and various propositions based thereon the verdict of the jury and the judgment of the trial court are attacked as being unsupported by the evidence, in that the notes were shown to be without consideration, and to be a part of a transaction contrary to public policy. The litigation grows out of the following state of facts:
The Silver Lake Oil Company was a corporation engaged in the production of oil. Its capital stock consisted of 40,000 shares, held by numerous stockholders. Among these were the plaintiff, William O'Briant, defendant, R. O. Anderson, J. T. Anderson, J. S. Swan, and others. O'Briant owned stock of the face value of $4,400.
At a meeting of the stockholders, March 11th, 1922, the stockholders with practical unanimity voted to sell the entire assets of the company at a "minimum price of twenty-five cents on the hundred," meaning thereby that the sale price was to be a sum equivalent to 25 per cent. of the capital stock. At this same meeting, on motion of J. T. Anderson, seconded by William O'Briant, a nominating committee was appointed to select and present names for a new board of directors for the Silver Lake Oil Company. After "due deliberation," as stated by the record, J. S. Swan, William O'Briant, R. O. Anderson, and two others were suggested by the committee for such directors, and the entire list recommended were unanimously elected. The stockholders' meeting adjourned. The new board of directors proceeded to organize by electing J. S. Swan president, William O'Briant vice president and general manager, and R. O. Anderson secretary and treasurer. Thereupon the board adjourned subject to call.
Pursuant to the above authority, said directors met May 10th, 1922, and by resolution then adopted voted "a sale of the company's holdings,consisting of property, both real and personal, of every kind, character,and description," for the amount of $10,927.50. This was estimated to be about 25 per cent. of the face value of the stock. The sale was thus directed upon the basis of the minimum value placed thereon by the stockholders at their March meeting. This action of the directors, as well as that of the stockholders, March 11, 1922, evidence but one purpose, and that the sale of the company's entire "holdings." The testimony of O'Briant, R. O. Anderson, and J. S. Swan confirms this view, and we do not regard the transaction as being a sale of the corporation stock. The resolution adopted by the directors above referred to, and signed by the plaintiff, O'Briant, is conclusive on that point.
O'Briant's testimony is to the effect that he opposed the sale, both at the stockholders' meeting and in the directors' meeting, but his mere dissent on those occasions could not have the legal effect to prevent or hinder the stockholders directing the sale of the company's assets, nor their sale by the directors, as evidenced by the resolution of May 10th. For all intents and purposes his interest in the holdings of the company passed by the sale as fully and completely as did the interests of the consenting stockholders. This being true, O'Briant, at the time R. O. Anderson executed and delivered the notes in suit to him, as well as at the time he agreed to execute and deliver the same, owned no interest in the assets of the company, and hence sold him nothing as a consideration for the notes. In the succeeding portions of this opinion other facts bearing upon the lack of consideration will be detailed, but enough has been indicated, we think, to justify our conclusion that the notes were executed without consideration. Hatchett v. Hatchett, 28 Tex. Civ. App. 33,67 S.W. 163; Richarz v. Wolchen, 34 Tex. 102.
The second contention of the appellant is that recovery should be denied to plaintiff, because the transaction of which the notes are a part was against public policy, in that, if there was a consideration, it was an illegal one. If the contract is illegal and void for reasons of public policy, recovery on the notes will be denied. The standard of conduct imposed by law upon those who have assumed the duties and obligations of directors in a corporation is very high, and rightly so. They must not, in any degree, permit their official conduct to be swayed by their private interest, unless that interest is the interest they have in the common good of the corporation and its stockholders. The private interest of a director must always yield to his official duty to the stockholders. Thompson, in his work on Corporations (volume 2, § 1342), says:
"The principle requiring directors to account for secret profits also requires them to account for and surrender to the corporation any gifts, gratuities, or bribes received by them for the purpose of influencing their official action. If the directors of a corporation receive a sum of money as a bribe for the doing of a certain act which may or may not be prejudicial to their company, they are trustees in equity of the fund so corruptly received, and the corporation may also proceed against them for any damages it has thereby suffered."
To the same effect is 14a Corpus Juris, § 1893, p. 125.
This indicates the general view the law takes of such transactions, and what the corporation may do to protect its stockholders in such instances. The authorities are general that notes executed under such circumstances and for such considerations are unenforceable. With these principles in mind, *Page 844 
reference may again be had to portions of the testimony in this record. Referring to the resolution by the directors authorizing the sale of the company's property, O'Briant testified:
"I signed that. I would not sign it then, and I never did sign it until Mr. Anderson made arrangements with me to buy it. I did not sign that at all until afterwards. I refused to sign it, and refused to sell my interest for that amount of money. I finally sold it when he fixed it with me. I say that I did not sign those minutes and agree to it until Mr. Anderson fixed me. I did not intend to sell my stock at that price. * * * I did sign those minutes, and that resolution, when he fixed me and gave me those notes. I did finally agree to that sale going through, in consideration of Mr. Anderson executing to me these notes sued on. As to these notes which were given being the difference between 25 cents on the dollar of the sale there and the full value of my stock, that is the full par value of my stock. * * * It is a fact that the officers and directors of the company were to get 100 cents on the dollar. * * * I signed it (referring to the resolution) after Mr. Anderson told me he would pay me that. * * * R. O. Anderson was handling all the transaction. * * * I refer to R. O. Anderson when I say I know he bought it. * * * My interest in the corporation, as shown by my stock certificates, amounted to 4,400 shares. * * * I have my stock certificates now which I had when I sold my interest for 25 per cent. with the rest of them. * * * I did not deliver these stock certificates to Mr. Anderson when I sold out. He did not ask for them. * * * He gave me 25 per cent. in cash and these notes here, signed by R. O. Anderson. * * * These notes were signed after. * * * After that, I can't tell exactly when it was, but it was one or two weeks, or maybe three weeks, * * * after the sale, he * * * fixed up the notes."
R. O. Anderson apparently made the same kind of arrangement with the vice president, J. S. Swan, for Swan testified:
"He did give me a note for my 75 per cent. He paid that note. I got my own money in full."
While O'Briant further testified that Anderson told him he meant to pay the other officers in full, and it is not denied by Anderson, yet there is no evidence in the record that they were, in fact, so paid. In any event, that would have no bearing upon the issues in this case. As before noted, the property was conveyed to J. T. Anderson, a stockholder in the company, who was also the father of R. O. Anderson. All the negotiations were conducted by R. O. Anderson. In the greater portion of his testimony it is indicated that he is purchasing the property for himself, and in other portions merely assisting his father to make the purchase. The conveyance of the property to J. T. Anderson has no special significance. R. O. Anderson further testified that he executed the notes with the understanding that they were to be paid if he was successful in making any money out of the property. An issue bearing upon this proposition was submitted to the jury and found against him.
The pertinent portions of the testimony have been sufficiently indicated. Unquestionably the stockholders authorized the sale of the entire assets of the corporation at a minimum price of not less than 25 per cent. of the face value of the corporation stock. No other limitation was prescribed, and doubtless it was the wish and desire of the stockholders that the assets might be marketed for a much greater sum. By virtue of their official position in the company it was the duty of the directors to obtain, not for themselves exclusively, but for the "numerous" stockholders in the ill-fated Silver Lake Oil Company, the highest possible price for its assets. This they failed to do. As noted, J. S. Swan testified that he was paid in full. O'Briant contends that R. O. Anderson promised him as much, as is evidenced by the notes involved in this suit, and from the manipulations between these officers, each of them must have deemed the assets of the company of sufficient value to justify R. O. Anderson in paying the extra amount necessary to make up the difference between the face value of their respective shares and the amount to which O'Briant and Swan were respectively entitled upon the pro rata distribution of the amount received for the assets of the company. Evidently these particular directors regarded the assets of the company as having a value much in excess of the amount they were to receive for the sale on the basis of 25 per cent. It cannot be denied that it was the duty of the directors to obtain for the company's assets the highest possible price, and that the individual stockholders were entitled to nothing less. These directors seem to have lost sight of that fact, and undertook to obtain for themselves an amount equal to the face value of their stock. In this they proved recreant to their duties and obligations as directors, and exhibited a disloyalty to the stockholders that has been uniformly condemned in the courts of this country.
If R. O. Anderson, in taking these assets, either for himself or his father, could afford to pay O'Briant and Swan 100 cents on the dollar, it was because the value of the assets justified the bargain. O'Briant and Swan evidently so estimated the value of the assets. Anderson must have held like views. Therefore, if he could afford to make a contract to pay these parties the amount indicated in this transaction, then clearly these directors were under obligations to and evidently could have sold the assets for more than 25 cents on the dollar, and this it was their duty to do. The effect of the arrangement which R. O. Anderson had with O'Briant and Swan, all being directors in the company, was to make a bargain which involved, on his part and on theirs, a violation of their duty to the corporation and to the individual stockholders. Therefore we *Page 845 
conclude, if nothing was obtained by the bargain, the notes were without consideration. If anything was obtained thereby, the consideration was illegal, and the transaction must be held contrary to public policy, and therefore unenforceable. We deem this a proper application of the legal standard to the facts involved. Anderson v. Freeman (Tex.Civ.App.)100 S.W. 350; Reed v. Brewer, 90 Tex. 144, 37 S.W. 418; Landes v. Hart et al., 131 A.D. 6, 115 N.Y.S. 337; Reed v. Johnson, 27 Wn. 42, 67 P. 381,57 L.R.A. 404; 3 R.C.L. p. 961, § 166; State v. Wilson, 73 Kan. 334,80 P. 639; 84 P. 737, 117 Am.St.Rep. 479, page 512, c. Secs. 1 and 2; Dickson et al. v. Kittson et al., 75 Minn. 168, 77 N.W. 820, 74, Am.St.Rep. 447.
This record bears evidence that O'Briant did not fully comprehend the legal significance of the transaction he negotiated with Anderson, but that can have no effect on the consequences visited thereon by the law in the interest of sound public policy. It is immaterial that he may not have understood the law applicable to the facts. The objection upon the part of R. O. Anderson that the contract is illegal and against public policy does not sound well in his mouth, but it is not for his sake that the objection is here allowed, and O'Briant denied a recovery; but it is allowed and rests upon a general principle or policy that the courts will not lend their aid in the enforcement of a contract based upon such a consideration. Standard Lumber Co. v. Butler Ice Co. (C.C.A.) 146 F. 359, 7 L.R.A. (N.S.) 467.
Each assignment urged by the appellant is sustained. If we are correct in our views, plaintiff cannot show a good cause of action upon another trial. The testimony has been fully developed.
The judgment of the trial court is reversed, and judgment is here rendered, denying the plaintiff a recovery upon the notes sued on.