No. 79,453

MARVIN BERGSTROM; MARILYN BERGSTROM; BEN DREESEN; KAREN DREESEN; and FARMERS LIVESTOCK COMMISSION CO., INC., a Kansas Corporation, *Appellants*, v. DON W. NOAH; NOAH & HARRISON, P.A.; and LYLE J. KOENIG, *Appellees*, ROGER McCARTNEY, d/b/a/ STOCKMAN'S LIVESTOCK EXCHANGE; and CHARLENE McCARTNEY, *Defendants*.

(974 P.2d 520)

830

Opinion filed March 5, 1999.

*John Terry Moore*, of Hinkle, Eberhart & Elkouri, L.L.C., of Wichita, argued the cause and was on the brief for appellants.

*Justice B. King*, of Fisher, Patterson, Sayler & Smith. L.L.P., argued the cause and was on the brief for appellees Don W. Noah and Noah & Harrison, P.A.

No appearance by appellee Lyle J. Koenig.

The opinion of the court was delivered by

DAVIS, J.: This is a malicious prosecution action growing out of a Kansas antitrust lawsuit filed by Roger McCartney, d/b/a Stockman's Livestock Exchange, and Charlene McCartney (hereinafter referred to collectively as the McCartneys) against Farmers Livestock Commission Co., Inc., Marvin Bergstrom, Marilyn Bergstrom, Ben Dreesen, and Karen Dreesen (hereinafter referred to collectively as the FLCC parties) in the District Court of Republic County, Kansas. The underlying antitrust action terminated in favor of the FLCC parties by summary judgment, which judgment was affirmed in an unpublished opinion of the Kansas Court of Appeals, *McCartney v. Farmers Livestock Comm'n*, No. 70,778, filed October 28, 1994. This court denied the McCartneys' petition for review.

The FLCC parties then filed a malicious prosecution action against the McCartneys. Summary judgment was entered by the trial court in favor of the McCartneys on the basis that probable cause existed for the filing of the antitrust action by the McCartneys. The issue we will resolve is whether on undisputed facts the trial court was correct in its determination that probable cause existed for the filing of the underlying antitrust action.

Dr. McCartney, one of the plaintiffs in the underlying action, is the owner of the sale barn in Belleville, Kansas. He purchased the

sale barn in 1985. Don W. Noah and his law firm, Noah & Harrison, P.A., were retained by Dr. McCartney in connection with the underlying antitrust action.

Marvin and Marilyn Bergstrom and Ben and Karen Dreesen are the owners of the Farmers Livestock sale barn in Washington, Kansas. They acquired the sale barn in a bankruptcy sale in 1984. Since that time they have operated the sale barn.

After 1985, the number of livestock being sold through the McCartneys' sale barn decreased. The McCartneys became concerned that they were losing business to the FLCC parties' sale barn and suspected that the FLCC parties were providing free and below-cost trucking for sellers to get their cattle to the barn. While providing free or below-cost trucking to sellers is not illegal, providing free or below-cost trucking on a discriminatory basis is a violation of the Packers and Stockyards Act of 1921, 7 U.S.C. § 181 *et seq.* (1994). The McCartneys knew that in 1985 the Packers and Stockyards Administration had issued a warning letter advising the FLCC and its owners to cease and desist from awarding discriminatory free or below-cost trucking.

In 1986, the McCartneys had made arrangements with a consignor, Eric Anderson, to purchase his cattle through his sale barn, Stockman's Livestock Exchange. The McCartneys became concerned when Anderson advised that the FLCC parties had contacted him and that he would be selling his cattle through the FLCC parties' sale barn.

The McCartneys discussed their concerns with other sale barn operators in the area and those operators supported the McCartneys' concerns that the FLCC parties were offering free or below-cost trucking in order to entice customers. Steve Werner, the owner of a sale barn in Fairbury, Nebraska, and a client of Lyle Koenig, a Nebraska attorney, had obtained information through one of his field men that the FLCC parties were offering free trucking and kickbacks through a trucking company owned and operated by Adolph Charbonneau, C & C Trucking. Werner gave this information to Koenig, who then related it to the McCartneys' attorney, Don W. Noah.

In 1988, the Packers and Stockyards Administration conducted an investigation of the FLCC parties' operation at the request of the McCartneys. However, no evidence of further violations was found. The head of the Packers and Stockyards Administration office in Lenexa, Kansas, later told the McCartneys that in his opinion, the investigation had been "poorly done." The McCartneys complained to the Packers and Stockyards Administration in November 1990, and in 1991 the McCartneys sent letters to U.S. Senator Bob Dole complaining that the Packers and Stockyards Administration had not done enough.

In August 1991, the McCartneys sent another letter to Senator Dole regarding the need for a more thorough investigation. This letter was copied to then U.S. Senator Nancy Landon Kassebaum, U.S. Representative Pat Roberts, Kansas Senator Janis Lee, Kansas Representative Bill Bryant, the editor of the Belleville Telescope, the Kansas Livestock Commissioner, and CBS's Sixty Minutes.

At the urging of the McCartneys, the Packers and Stockyards Administration instituted another investigation in 1991 of the FLCC parties' operations. The McCartneys submitted a list to the Packers and Stockyards Administration's investigators, naming 40 farmers, 3 commercial truckers, and 4 farm truckers whom the McCartneys believed had had their trucking costs paid or had received part of their commission back, or both, from the FLCC parties. The investigators randomly interviewed six farmers and discovered one farmer, Dean Anderson, who admitted to having had some of his trucking costs paid by the FLCC parties. The investigation also found another farmer, Francis Baxa, normally had had trucking costs deducted from his sale proceeds by the FLCC parties, but on at least one occasion, no trucking costs had been deducted.

As a result of the 1991 investigation, the Packers and Stockyards Administration issued another warning letter to the FLCC parties:

"During an investigation of Farmers' business operations, the following violation of the Packers and Stockyards Act was discovered.

"The investigation disclosed that Farmers, for the purpose of inducing certain owners to consign their livestock to the market, provided free transportation of

livestock. The Packers and Stockyards Administration considers this an unfair and unjustly discriminatory practice under sections 307 and 312(a) of the Act.

"Enclosed is a copy of the Packers and Stockyards Act. The relevant sections can be found on pages 14 and 18. We trust you will take immediate steps to bring your operation into compliance. If you have any questions, please contact this office."

In October 1991, Noah was retained by the McCartneys to assist them in obtaining access to the books and records of the FLCC parties' business in order to uncover what he believed to be a pattern of illegal activity and to bring this activity to an end. The McCartneys told Noah that they noticed the FLCC parties' sale barn drawing consignors from various locations that were much closer to other sale barns and that many people were telling him it was no secret that the FLCC parties were offering illegal inducements to consignors. The McCartneys also told Noah that they had heard that the free trucking and illegal inducements were buried so deep in the books of the FLCC parties that the Packers and Stockyards Administration would never discover the illegal inducements.

Noah obtained the records from the original Packers and Stockyards Administration investigations and was aware of the cease and desist letters sent to the FLCC parties. He was also aware that the FLCC parties had admitted to offering illegal free trucking in 1985. Through his additional investigation, Noah developed evidence that the FLCC parties had offered free trucking to two other consignors in return for bringing their cattle to the FLCC parties' sale barn, and that Marvin Bergstrom had reimbursed one of the consignors from his personal farm account. Noah also received information that Brian Larson and his father had received free trucking for their cattle, and, when deposed, Brian Larson admitted that he had gotten a check for $400 from the FLCC parties for trucking expenses.

An investigator for Noah related that when Bergstrom was questioned about providing free trucking, he stated, "I'm not saying I am and I'm not saying I'm not, but free trucking is a part of doing business in this country." Bergstrom also told the investigator that he knew of a lot of people who were offering free trucking in the

area to attract business. Noah felt that these statements were indicative of Bergstrom's attitude in violating the law.

Noah notified the Packers and Stockyards Administration investigators that he had been told by Gene Heyka that Heyka's trucking had been paid by the FLCC parties but upon investigation, the investigators did not discover any evidence. In February 1992, the Packers and Stockyards Administration informed Noah and the McCartneys that it did not intend to continue its investigation because it could not find any evidence of free trucking offered by the FLCC parties.

Thereafter, Noah received information from Steve Werner in Nebraska that other consignors in Nebraska were receiving free trucking from the FLCC parties and that in at least one instance, the FLCC parties had guaranteed one of the consignors a minimum price for his cattle, another illegal practice. Noah hired Rex Woods, a certified public accountant, who informed him that if the FLCC parties' books were correct, he would be able to discover evidence of any illegal inducements made.

On March 26, 1992, Noah filed suit on behalf of the McCartneys against the FLCC parties. The petition alleged three counts: (1) The FLCC parties had formed a trust through a combination of capital, skill, and acts by two or more persons, firms, corporations, or associations of persons to create a monopoly in the sale of livestock in North Central Kansas and South Central Nebraska, in violation of K.S.A. 50-101; (2) the FLCC parties had conspired and combined with other persons, firms, or corporations for the purpose of monopolizing the sale of livestock in North Central Kansas and South Central Nebraska, in violation of K.S.A. 50-132; and (3) the FLCC parties had agreed among themselves, their corporation, and with others to offer certain consignors favorable treatment on commissions while failing to offer other consignors favorable treatment on commissions, and to thereby defraud a portion of the public they are required to serve under the Packers and Stockyards Act, in violation of K.S.A. 50-112.

Noah sent no demand letter to the FLCC parties, nor did he extend to them the opportunity to respond with their version of the facts prior to filing the antitrust suit. See *Nelson v. Miller*, 227

Kan. 271, 284-85, 607 P.2d 438 (1980). Noah did not do so because he felt that such contact would have been useless.

The FLCC parties filed a motion for summary judgment alleging among other things that the McCartneys had failed to show a conspiracy to monopolize existed between the FLCC parties and any other party. The McCartneys responded, arguing that they were proceeding under two theories. The first of these theories was that a conspiracy to monopolize existed between the FLCC parties and the truckers and consignors who accepted the illegal inducements, or that a conspiracy existed between the individual FLCC parties and their corporation under a "personal stake" exception. The second theory was an "attempt to monopolize" theory, which did not require a conspiracy.

The trial court initially concluded that there was evidence from which a trier of fact could find that the "personal stake" exception had been met. The court also found that no conspiracy to monopolize was necessary under an attempt to monopolize theory. Accordingly, the court denied summary judgment.

The FLCC parties filed a motion for reconsideration, noting that the court had ruled before the time had expired for the FLCC parties to respond. The FLCC parties noted that the McCartneys had brought forth no evidence in support of the independent personal stake exception and further that there was no cause of action for attempt to monopolize under Kansas law.

The court granted the FLCC parties' motion for reconsideration. The court concluded there was no cause of action under Kansas statutes for an attempt to monopolize, there was no evidence that any of the FLCC parties had an independent personal stake, and neither the consignors who accepted free trucking nor the trucking companies that provided the trucking would qualify as coconspirators under the antitrust cause of action. Accordingly, the court awarded summary judgment to the FLCC parties.

The Court of Appeals affirmed summary judgment, concluding that evidence of a conspiracy or trust between two or more persons or entities must be present in order to proceed under K.S.A. 50-101, K.S.A. 50-112, or K.S.A. 50-132. The Court of Appeals agreed with the trial court that there was no conspiracy shown and that

there was no evidence to support application of the independent personal stake doctrine. Finally, the Court of Appeals found that the McCartneys had abandoned their attempt to monopolize argument. A petition for review was denied.

The FLCC parties instituted the present action for malicious prosecution against the McCartneys, Stockman's Livestock Exchange, and their attorneys, Don W. Noah and Noah & Harrison, and attorney Lyle Koenig of Nebraska. The McCartneys filed a cross-claim against their attorney, Noah, and the law firm of Noah & Harrison, P.A., for legal malpractice in the antitrust case. The legal malpractice cross-claim is the subject of a separate appeal to this court.

After extensive discovery, the McCartneys filed a motion for summary judgment on the malicious prosecution claim. The trial court granted summary judgment, concluding that there was no genuine issue of fact on the question of probable cause and that the McCartneys, Stockman's Livestock Exchange, and their attorneys had a sufficient basis in law amounting to probable cause for filing the antitrust lawsuit. In so doing, the trial court noted the Kansas antitrust statutes relied upon by the McCartneys were broad and undeveloped and, therefore, a colorable claim existed.

Because the malpractice cross-claim filed by the McCartneys against Noah and Noah & Harrison still remained to be decided, the trial court certified the summary judgment on the malicious prosecution claim as a final judgment under K.S.A. 60-254(b). The Court of Appeals accepted the appeal, and we transferred the appeal to this court. Our jurisdiction is based upon K.S.A. 20-3018(c).

## Discussion and Analysis

The FLCC parties' claim in this case was for malicious prosecution. In *Nelson v. Miller*, 227 Kan. at 276, we stated:

"To maintain an action for malicious prosecution of a civil action the plaintiff must prove the following elements:

(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

(b) That the defendant in so doing acted without probable cause.

(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

(d) That the proceeding terminated in favor of the plaintiff.

(e) That the plaintiff sustained damages."

It is undisputed that the McCartneys initiated civil procedures against the FLCC parties and that the proceeding terminated in favor of the FLCC parties. The trial court did not address the issues of malice or damages but decided that as a matter of law, probable cause existed for the filing of the underlying antitrust case. The sole question before this court is whether the trial court was correct in its legal conclusion that probable cause existed for the filing of the underlying antitrust action.

Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining. *Nelson v. Miller*, 227 Kan. at 277. This inquiry is limited to the facts and circumstances as they appeared to the initiator at the time the prosecution was commenced. 227 Kan. at 277. If the legal validity of a claim is uncertain, the question is not whether the person bringing the claim is correct in believing that the court would sustain the claim, but rather is whether that person's opinion that there was a sound chance that the claim might be sustained was a reasonable one. *Sampson v. Hunt*, 233 Kan. 572, 583, 665 P.2d 743 (1983). If the facts are undisputed, the question of whether probable cause existed is one for the court to decide as a matter of law, but where the facts tending to establish the existence or want of existence of probable cause are in dispute, the trial court has the duty to submit the question to the jury. *Nelson v. Miller*, 227 Kan. at 277-78.

The question comes before us upon summary judgment. Our standard of review is well established:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to inter-

rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

Before we begin our discussion of the legal question, we note that the McCartneys settled with the FLCC parties on their malicious prosecution claim while this appeal was pending. Thus, for purposes of this appeal, the only remaining parties in whose favor summary judgment was granted are the attorneys, Don W. Noah, Noah & Harrison, and Lyle Koenig. Our review involves the sole question of whether the attorneys had probable cause under the facts determined by the trial court to be uncontroverted to file the underlying antitrust action. Where attorneys are sued for malicious prosecution of a civil action, special rules apply in determining liability. See *Goss v. Reid*, 242 Kan. 782, 784-85, 751 P.2d 131 (1988); *Nelson v. Miller*, 227 Kan. at 282.

*Nelson v. Miller* involved a Wichita physician's malicious prosecution action against several attorneys seeking to recover damages for a malpractice action brought against him by the several attorneys. 227 Kan. at 272-73. We adopted language from Restatement (Second) of Torts § 674, Comment d (1977), relating to the liability of an attorney in such an action:

" 'd. Attorneys. An attorney who initiates a civil proceeding on behalf of his client or one who takes any steps in the proceeding is not liable if he has probable cause for his action (see § 675); and even if he has no probable cause and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim. (See § 676.) An attorney is not required or expected to prejudge his client's claim, and although he is fully aware that its chances of success are comparatively slight, it is his responsibility to present it to the court for adjudication if his client so insists after he has explained to the client the nature of the chances.' " 227 Kan. at 282-83.

Liability under this standard does not solely rest upon the validity of the McCartneys' antitrust claims under the facts known to

the initiating attorney at the time the underlying action was filed. Nor are we called upon to analyze the holding of the Court of Appeals with reference to the underlying merits of the antitrust claims. While the antitrust claims were rejected by the district court and the Court of Appeals as being legally insufficient under Kansas antitrust law, these unfavorable results alone do not establish malicious prosecution.

The question before us is whether Don Noah's opinion that there was a sound chance that his client's Kansas antitrust claims might be sustained was a reasonable one. Both *Nelson v. Miller* and Restatement (Second) of Torts § 675 (1977), discuss the meaning of probable cause in wrongfully initiated civil proceedings. 227 Kan. at 283-84. Section 675 provides, in part:

"One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and . . .

(a) correctly or reasonable believes that under those facts the claim may be valid under the applicable law."

The question then, as identified above, is whether Noah correctly *or* reasonably believed that under the facts before him, the claims advanced in the antitrust action *might be valid under the applicable law.*

In differentiating between wrongfully initiated criminal and civil proceedings, Section 675 of the Restatement (Second) of Torts, Comment d, notes:

"[W]hen the proceedings are civil, while the person initiating them cannot have a reasonable belief in the existence of the facts on which the proceedings are based if he knows that the alleged facts are not true and his claim is based on false testimony, it is enough if their existence is not certain but he believes that he can establish their existence to the satisfaction of court and jury. In a word, the initiator of private civil proceedings need not have the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings. In many cases civil proceedings, to be effective, must be begun before all of the relevant facts can be ascertained to a reasonable degree of certainty. To put the initiator of civil proceedings to a greater risk of liability would put an undesirable burden upon those whose rights cannot be otherwise effectively enforced."

We observe again that the facts in this case are uncontroverted as to probable cause. There is no claim that in filing the underlying action Noah based the antitrust action on facts he knew to be false or upon false testimony. On the contrary, he possessed evidence from past Packers and Stockyards Administration investigations and his own investigation that the FLCC parties had violated federal law in granting discriminatory trucking to its customers. He and his client also believed that his client's business had been negatively impacted by the FLCC parties' practice, a claim which was supported by his client's falling revenues. He also had evidence which indicated that at least on one occasion and perhaps more, C & C Trucking had been used by the FLCC parties to effect delivery of cattle to the FLCC parties at no cost to the cattle owner. Noah also hired an accountant who indicated that he would be able to discover improper inducements made by the FLCC parties to its customers upon examination of the FLCC parties' accounting records. While the facts at the time the underlying action was filed may have been uncertain, "it is enough if their existence is not certain but he [Noah] believes that he can establish their existence to the satisfaction of court and jury." Restatement (Second) of Torts § 675, Comment d.

Just as the facts existing at the time the underlying action is filed are important, a consideration of the legal basis for the underlying action is also important. According to the trial court's decision in the underlying antitrust action, the uncontroverted facts did not support a Kansas antitrust action as a matter of law. The Kansas Court of Appeals affirmed, based primarily upon its conclusion that there was no evidence of conspiracy, a legal requirement under Kansas antitrust law. The FLCC parties argue that the legal conclusions of the trial court and the Court of Appeals in the underlying antitrust action demonstrate the legal invalidity of the antitrust action filed by Noah and support a conclusion that there was no probable cause to file it.

As pointed out above, the legal validity of the underlying action as finally determined by a court of law is not determinative of probable cause. As noted in the Restatement (Second) of Torts § 675, Comment e, "[i]n determining probable cause for initiation

of civil proceedings, all that is necessary is that the claimant reasonably believes that there is a sound chance that his claim may be held legally valid upon adjudication."

In discussing legal uncertainty, Comment f further provides:

"If the legal validity of a claim is uncertain, the person who initiates the civil proceeding may believe that his claim is meritorious, but he can have no more than an opinion that the chances are good that the court might decide to uphold it. The question is not whether he is correct in believing that the court would sustain the claim, *but whether his opinion that there was a sound chance that the claim might be sustained was a reasonable one.* To hold that the person initiating civil proceedings is liable unless the claim proves to be valid, would throw an undesirable burden upon those who by advancing claims not heretofore recognized nevertheless aid in making the law consistent with changing conditions and changing opinions." (Emphasis added.)

In this malicious prosecution action, the trial court determined as a matter of law that probable cause existed for the filing of the underlying antitrust action. If the trial court's determination of this issue is correct, we must affirm. The question raised by this appeal is not whether Noah was correct in believing that the district court of Republic County would sustain the antitrust claims. Rather, the question we must resolve is whether Noah reasonably believed in the facts upon which the antitrust action was based and whether his opinion that the court would sustain his claims was a reasonable one. Without belaboring all the facts considered by the trial court in arriving at is conclusion, it is apparent that both the McCartneys and Noah reasonably believed based on the existence of facts known to them and to be further developed in discovery, that the FLCC parties were engaging in improper, if not illegal, business practices designed to stifle competition and ultimately cause the McCartneys' business to fail. There is no evidence that these facts were false or based upon known false testimony. In reviewing the uncontroverted facts relied upon by the trial court, it is enough if both the McCartneys and Noah believed that with discovery a solid factual basis would be established to the satisfaction of court and jury.

In rendering its summary judgment in this case the trial court also concluded that there existed a legal basis for filing the underlying antitrust action:

"The Court further concludes that the named defendants had a sufficient basis in the law which amounted to probable cause for filing the underlying lawsuit. Don Noah concluded that the lawsuit should be filed under K.S.A. 50-101, K.S.A. 50-132, K.S.A. 50-112 and K.S.A. 50-801. Noah relied on these statutes as authority that offered a reasonable probability of injunctive relief and damages to his client. K.S.A. 50-112, and other statutes relied on by the plaintiffs in the underlying litigation are broad and undeveloped by case law. Therefore, Mr. Noah could have reasonably believed that McCartney's claim, even with the difficult issue of conspiracy, would be a suitable vehicle to develop the law of this state. Hindsight notwithstanding, the Court concludes that a colorable claim existed."

We agree and believe that the above conclusion by the trial court is consistent with Kansas law. The three statutes under which the appellees based their claims are very similar. K.S.A. 50-101 provides:

"A trust is a combination of capital, skill, or acts, by two or more persons, firms, corporations, or associations of persons, or either two or more of them, for either, any or all of the following purposes:

"*First*. To create or carry out restrictions in trade or commerce, or aids to commerce, or to carry out restrictions in the full and free pursuit of any business authorized or permitted by the laws of this state.

"*Second*. To increase or reduce the price of merchandise, produce or commodities, or to control the cost or rates of insurance.

"*Third*. To prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities, or to prevent competition in aids to commerce.

"*Fourth*. To fix any standard or figure, whereby its price to the public shall be, in any manner, controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, use or consumption in this state.

"*Fifth*. To make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which they shall bind or have to bind themselves not to sell, manufacture, dispose of or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure; or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graded figure; or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in transportation, sale or manufacture of any such article or commodity; or by which they shall agree to pool, combine or unite any interest they may have in connection with the manufacture, sale or transportation of any such article or commodity, that its price may in any manner be affected. And any such combinations are hereby declared to be against public policy, unlawful and void."

K.S.A. 50-112 provides:

"All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view or which tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state, or in the product, manufacture or sale of articles of domestic growth or product of domestic raw material, or for the loan or use of money, or to fix attorneys' or doctors' fees. and all arrangements, contracts, agreements, trusts or combinations between persons or corporations, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles, or to control the cost or rate of insurance, or which tend to advance or control the rate of interest for the loan or use of moneys to the borrower, or any other services, are hereby declared to be against public policy, unlawful and void."

Finally, K.S.A. 50-132 provides:

"Every person, servant, agent or employee of any firm or corporation doing business within the state of Kansas that shall conspire or combine with any other persons, firm or corporation within or without the state for the purpose of monopolizing any line of business, or shall conspire or combine for the purpose of preventing the producer of grain, seeds or livestock or hay, or the local buyer thereof, from shipping or marketing the same without the agency of any third person, firm or corporation, shall be deemed guilty of a misdemeanor, and on conviction shall be fined in a sum not less than one thousand dollars and not to exceed five thousand dollars for each offense."

K.S.A. 50-801 provides that any person who may be damaged or injured by any agreement, monopoly, trust, conspiracy, or combination declared unlawful by the acts contained in Chapter 50 shall have a cause of action against any such person causing such damage or injury and may recover treble damages.

That the statutes are broad may not be denied. That there has been no meaningful interpretation of these statutes in Kansas is also true. For a comprehensive discussion of the state of antitrust law under the Kansas statutes at the time Noah filed the underlying antitrust action, see Kenton C. Granger, A Glimpse at a Plaintiff's Remedies Under Kansas' Antitrust Laws, 8 Washburn L.J. 1 (1968). The statutes relied upon by Noah were enacted 1889, 1897 (a year before Congress passed the Sherman Act), and 1899. The statutes have been virtually ignored by the bar, with only a few cases coming to this court since their enactment.

The last case decided by this court involving the above antitrust law of this state was *Okerberg v. Crable*, 185 Kan. 211, 341 P.2d 966 (1959). *Okerberg* involved an interpretation of 50-101 and 50-112, as related to the issue of whether a certain regulation that set routes among milk carriers was void per se as against the above statutes and policy of this state. It is of little value with regard to the issues in the case at hand. In *Gard v. Holmes*, 132 Kan. 443, 295 P.2d 716 (1931), the question resolved by this court was whether a secret contract between undertakers was in violation of the antitrust statutes of 1889 and 1897. This court held that it was in violation and that the notes sued on were an inherent and essential part of the illegal transaction, non-collectible, and void. Again, the case offers little help. The earlier case of *State v. Wilson*, 73 Kan. 334, 80 Pac. 639 (1906), relied on in part by Noah as a legal basis for initiation of the underlying antitrust action, contains the following quote:

"[Laws of 1897, G.S. 1901, § 7864 through § 7874, now K.S.A. 50-101 through K.S.A. 50-110] is very sweeping in its provisions. It defines and denounces five kinds of combinations, which it denominates trusts. The definitions are couched in general terms, but cover almost every conceivable device by which freedom of commerce might be hampered, competition restricted, or the price of commodities controlled. All acts done in pursuance of any of the arrangements interdicted by these various statute are made misdemeanors." 73 Kan. at 337.

Kansas antitrust law provided little if any guidance for the initiation of the underlying Kansas antitrust claims advanced by Noah. As the trial court stated:

"K.S.A. 50-112, and other statutes relied on by the plaintiffs in the underlying litigation are broad and undeveloped by case law. Therefore, Mr. Noah could have reasonably believed that McCartney's claim, even with the difficult issue of conspiracy, would be a suitable vehicle to develop the law of this state."

The FLCC parties argue that Noah's claims would have had no chance of success had they been filed under the Sherman Antitrust Act. (15 U.S.C. 1 *et seq.* [1994]). Kansas law is similar in some respects to the Sherman Act, but it is not identical. In fact, some of the statutes relied upon by Noah predate the Sherman Act. While it was certainly foreseeable that the court might find as it ultimately did, that Kansas law follows the Sherman Act with re-

gard to the requirements of a conspiracy to monopolize, such a conclusion was by no means certain. The FLCC parties devote considerable time in their brief and in argument before this court on the state of federal antitrust cases interpreting the Sherman Act. While such cases may be persuasive authority for any state court interpreting its antitrust laws, such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws. Given the state of antitrust law in Kansas and the uncontroverted facts, the belief that there was a sound chance the claims made in the underlying action might be held legally valid upon adjudication was not an unreasonable one.

The FLCC parties also argue that Noah knew that there was no evidence in the case to establish a conspiracy, which was critical to a successful Kansas antitrust action. The FLCC parties contend that without evidence of a conspiracy, both factually and legally, the underlying antitrust action was fatally flawed and filed without probable cause.

Contrary to the argument of the FLCC parties, there was evidence developed by Noah prior to filing the underlying antitrust action that on at least one occasion and likely on more than one occasion, Adolph Charbonneau, d/b/a/ as C & C Trucking, had been paid directly by the FLCC parties for transportation of a customer's cattle to their sale barn. The Court of Appeals did not address this aspect in the underlying case. We mention it here not to demonstrate that a conspiracy existed between C & C Trucking and the FLCC parties, for ultimately this proved not to be the case. Instead, we mention it because it relates to the question of whether Noah's belief that there was a sound chance the claims made in the underlying action might be held legally valid upon adjudication was a reasonable one.

Under the uncontroverted facts and Kansas antitrust law, we agree with the conclusion of the trial court:

"This Court has attempted to review the undisputed facts to ascertain those facts and information in the mind of Don Noah and the other defendants at the time the underlying litigation was filed. The records support a finding that Mr. Noah and those assisting him in the suit proceeded in good faith to prosecute a colorable claim to obtain appropriate relief for a client."

Specifically, we conclude that Noah's opinion that there was a sound chance that the antitrust claims made in the underlying action filed on behalf of the McCartneys might be sustained was a reasonable one. Accordingly, we affirm the trial court's entry of summary judgment.

Affirmed.