NOT DESIGNATED FOR PUBLICATION

No. 112,833

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DREW HUBER,
*Appellant*,

v.

HAROLD ENGLE, JR.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Greenwood District Court; JANETTE L. SATTERFIELD, judge. Opinion filed April 8, 2016. Affirmed.

*Dan E. Turner* and *Phillip L. Turner*, of Turner & Turner, of Topeka, for appellant.

*Karen K. McIlvain*, of McIlvain Law Office, LLC, of Madison, for appellee.

Before STANDRIDGE, P.J., BUSER and SCHROEDER, JJ.

BUSER, J.: After Harold Engle, Jr., voluntarily dismissed his lawsuit against Drew Huber, which challenged Huber's construction of levees along the banks of the Verdigris River without a permit from the Kansas Department of Water Resources (KDWR), Huber sued Engle for malicious prosecution of a civil action. Subsequently, the district court entered summary judgment in favor of Engle and dismissed Huber's malicious prosecution lawsuit.

On appeal, Huber contends the district court erred in finding that Engle had probable cause to initiate or continue his lawsuit against Huber regarding the construction

1

of the levees. We disagree with Huber's contention and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On November 19, 2010, Engle filed a lawsuit against Huber alleging that he was illegally constructing levees along the Verdigris River in Greenwood County, Kansas. Specifically, Engle asserted that Huber's actions violated K.S.A. 2015 Supp. 24-126, which prohibits the construction of "any levee or other such improvement on, along or near any stream of this state which is subject to floods, freshets or overflows, so as to control, regulate or otherwise change the flood waters of such stream" without a permit from the KDWR. See K.S.A. 2015 Supp. 24-126(a). Of note, K.S.A. 2015 Supp. 24-126(a) also provides, in relevant part, that any person who violates the act shall be guilty of a misdemeanor. In his lawsuit, Engle claimed that unless the illegal construction ceased, his property, its value, and the income he derived from it, would be detrimentally affected.

According to Engle's lawsuit, although the KDWR granted Huber a permit (LGW-0007) in 2002, this permit only authorized Huber to place "fill along a bank of the Verdigris River" and it did not give him the authority to raise the height of the bank. Engle explained that Chris Warren, a KDWR employee, had confirmed that Huber's application for a permit to construct a levee (LGW-0011) along the river banks was pending. Yet, although "[Huber] had not been granted approval or authorized (as required by law) to build any levee," Engle had personally observed Huber constructing the levees. As a result, Engle, through Warren, "renewed his earlier complaint" with the KDWR about LGW-0007 by alleging that the work was outside the permit's scope and he lodged a complaint regarding Huber's decision to erect two levees without a permit.

2

In his lawsuit, Engle insisted that the illegal levees were "seriously and irreparably changing the flow of the flood waters to [his] detriment . . . [by] causing a higher volume of flood waters to be diverted onto [his] land and scouring channels in [his] property." Engle requested a declaratory judgment finding Huber's construction of the levees and/or diversion of water was unlawful and finding that any unpermitted levees must be immediately removed and the Verdigris River restored to its original condition.

Engle also moved for a temporary restraining order because, according to Engle, irreparable harm would come to him if Huber continued building levees in "total disregard for the law[, because] . . . [o]nce soil is washed away and the land scoured it cannot be replaced" and in the event of heavy rain, his land would flood. Engle maintained that while he had "tried to address this matter through [the] KDWR, but [the agency] ha[d] not yet performed an inspection and [was] unable to tell [him] when an inspection [would] be performed[; thus], his only recourse [was to] turn to the courts for a restraining order."

The same day that Engle filed his lawsuit, the district court granted him a temporary restraining order. The district court ordered Huber to refrain from "constructing or continuing to construct, any non permitted levees along the bank of the Verdigris River . . . or in any way diverting or changing the flow of water along [its] banks . . . without proper, lawful authorization from [the] KDWR." The restraining order was to remain in effect until the commencement of a hearing, which either party could request. See K.S.A. 60-903.

On December 7, 2010, Huber sent Engle a letter demanding that he "withdraw the restraining order and dismiss the [p]etition because it was not brought in good faith." The next day, Huber filed an answer asserting a general denial and several affirmative defenses. Huber insisted that Engle's "complaints as to said construction [were] completely without merit" because, on December 2, 2010, the KDWR advised him that a

3

"permit was not required for restoring the channel bank to its original condition." Huber attached a copy of a letter he received from the KDWR's Water Structures Engineer, Edward E. Byrd, P.E.:

> "This will acknowledge receipt of your request for a permit determination. This project will consist of restoring the channel bank back to its original condition[.] . . .
> "After reviewing the information received in this office on November 30, 2010, we have concluded that this project is not within the jurisdiction of this agency under K.S.A. [2010 Supp.] 82a-301. This statute states: 'Jetties or revetments for the purpose of stabilizing a caving bank which are properly placed shall not be construed as obstructions . . . .' Provided you do not modify the cross-section of the stream, by flattening the bank for example, a permit will not be required from this agency."

Subsequently, on December 13, 2010, Byrd sent Huber a letter explaining that on December 6, 2010, he conducted an onsite inspection of the various structures Huber had erected on his land along the Verdigris River, *i.e.*, "a previously permitted levee" (LGW-0007) and a levee (LGW-0011) for which a permit was currently under review. According to Byrd, the inspection was due to the KDWR's receipt of information indicating that LGW-0007 may not be in compliance with the approved plan and that both levees may be causing damage to an adjacent landowner's property. Byrd detailed his findings:

> "During the inspection, [Huber] showed me the project area for LGW-0007. This levee is still under construction. . . . I observed that work was continuing with the placement of broken concrete and other fill material at approximately the same location as shown on the approved plans. It did not appear at the inspection that the fill extended beyond the original eroded area of the old stream channel.
> "Also, [Huber] showed me the location of the other after-the-fact levee, LGW-0011. It appeared that work had recently been completed on the levee. [Huber] explained that the levee suffered damage from flooding that occurred earlier this year. [Huber] also brought the survey equipment and gathered additional elevation data necessary for further

4

consideration by the Chief Engineer for approval. Based on the previous plans that [Huber] submitted to our office, it did not appear that the apparent repair work had modified the levee as described in the current submitted plans. Further, any hydraulic impacts would be on property owned by [Huber].

"[Huber] also showed me a pump pad to be used to situate his pump to be used for irrigation of crops on a nearby field. The pad was located near LGW-0011. The pad extended about ten feet beyond the existing stream bank on the Verdigris River, creating a stream obstruction. I determined it to be jurisdictional in the current configuration. Based on this determination, I informed [Huber] that he must modify the pad so it does not extend beyond the stream bank of the river, or submit an application for a channel change and/or stream obstruction[.] . . .

"Finally, [Huber] showed me an eroded area on a tributary to the Verdigris River identified as CGW-0037. [Huber] recently submitted an application for a permit and received a non-jurisdictional letter from our office because it involved bank stabilization. Based on my findings at this inspection, I confirmed to [Huber] that this activity is indeed non-jurisdictional as set forth in our letter dated December 2, 2010. He is currently in compliance with K.S.A. [2010 Supp.] 82a-301 to 305a regarding this activity. There was also one final levee that [Huber] had had recently completed repairs to as well, identified as LGW-0012. Our office had previously determined this levee to be non-jurisdictional, and it did not appear to have been modified from the information provided to us in the approval determination. Therefore, no further action will be taken on this levee at this time.

"Based on the observations at the inspection, *it was determined that LGW-0007 was still under construction, and should be completed soon as shown on the approved plans. . . . The pump pad is currently in non-compliance with K.S.A. [2010 Supp.] 82a-301 to 305a and will need to be modified to be non-jurisdictional, or an approval should be pursued from the Chief Engineer. . . . There will be no further action to be taken on LGW-0007 at this time. However, LGW-0011 will remain in non-compliance until it is removed or an approval is given by the Chief Engineer. No further work should be performed on this levee unless prior approval is issued by the Chief Engineer."* (Emphasis added.)

5

Byrd concluded his letter by advising Huber it was "possible that other action may be taken, if necessary to ensure that [his] levees [did] not cause an adverse hydraulic impact or any other detrimental effects on lands not owned by [him]" and that he "may be liable for any flood damages that [we]re determined to be caused by [his] levees."

The next day, December 14, 2010, Huber sent Engle a copy of Byrd's letter along with a request that Engle immediately advise whether he planned to release the temporary restraining order. In response, Engle stated he would not dismiss his claims unless Huber removed the unauthorized structures he had erected. Engle explained that not only did the restraining order not place any undue burden upon Huber, because it only prevented him from constructing or continuing to construct non-permitted levees, the order was fully appropriate because his conversations with the KDWR and Byrd's letter both confirmed that Huber had performed unauthorized construction and was in noncompliance with governing statutes.

On January 24, 2011, Huber filed an application with the KDWR for approval to alter the point of diversion by changing the "location of one of the three authorized pumpsites . . . to a point downstream approximately 140 feet." Almost 1 year later, on January 3, 2012, Chad Voigt, P.E., the Water Structures Program Manager for the KDWR, advised Engle that Huber intended to submit engineering data and calculations to support his permit applications for levee modifications on his property. While Voigt had not yet received that information, Voigt told Engle that based on his conversations with Huber, he expected the "survey work should have been completed by now, and the analysis of that data should be in progress and submitted in the near future."

Two months later, on March 13, 2012, Voigt advised Engle that the KDWR had reviewed Huber's engineering data and had decided to approve his applications for the "two levee locations and the bank grading for a pump site" and, thus, Huber was now in

compliance with KDWR regulations. One week later, on March 20, 2012, Huber sent Engle another letter demanding that he withdraw the temporary restraining order.

Shortly thereafter, however, Huber apparently submitted a plan revision to the KDWR for LGW-0011 and LGW-0012. The KDWR approved Huber's revised plans on April 3, 2012, with the modification that the work authorized by the permit must be completed on or before July 1, 2014.

Three months later, on July 2, 2012, Engle filed a motion to dismiss with prejudice his allegations regarding the improper building of the levees because Huber had obtained postapproval for their construction from the KDWR. Engle also sought to dismiss his request for damages without prejudice because while his property had not yet been damaged, the building of the levees could cause damage in the future. In response, Huber objected to the dismissal on the ground that all of Engle's allegations, including his request for damages, should be dismissed with prejudice. Huber also filed a motion for summary judgment on July 2, 2012, requesting such a dismissal.

On August 28, 2012, the district court dismissed Engle's allegations pertaining to the unauthorized construction of the levees with prejudice and his request for damages without prejudice.

One year later, on August 5, 2013, Huber sued Engle for malicious prosecution of a civil action. Huber alleged that not only had Engle brought a lawsuit against him without probable cause, he had continued to prosecute the frivolous lawsuit for "a malicious purpose."

Engle responded by moving for summary judgment on the ground that Huber had not established a prima facie claim for malicious prosecution. In particular, he asserted

that Huber had failed to come forward with evidence to support the essential elements of a malicious prosecution claim.

Huber countered that sufficient evidence existed to support his malicious prosecution claim. Specifically, Huber claimed that Engle did not have probable cause to initiate his lawsuit because, as demonstrated by a complaint Engle filed with the KDWR in 2007, and Engle's correspondence with the agency in 2008, Engle knew about his pending permit applications for LGW-0007 and LGW-0011, and, thus, Engle had no reasonable basis to file a lawsuit until the KDWR ruled on the applications. In the alternative, or as an additional act of malicious prosecution, Huber claimed that while Engle did not have probable cause to continue the lawsuit after the KDWR granted his permit applications, Engle waited "more than ninety (90) days after receiving actual knowledge of the approval [to request a voluntary dismissal] and [he] ha[d] not set forth any rational basis for the delay."

In response, Engle acknowledged that on February 14, 2007, and April 4, 2008, he sent Byrd a letter to follow up on the complaint he had registered with the KDWR regarding levees constructed under permits LGW-0007 and LGW-0011. He also acknowledged that on June 6, 2008, his attorney requested a complete copy of the KDWR's files which related to permitting, complaint, enforcement, inspection, and/or review of the levees in question, but Engle asserted that he had no obligation to wait for the KDWR to act prior to initiating his lawsuit. Additionally, Engle insisted that he took no further action to prosecute the case after the KDWR granted Huber's permit applications, and Huber was not harmed during the 90 days prior to his dismissal request because the restraining order only prohibited Huber from constructing structures for which he did not have a permit.

On July 1, 2014, the district court issued a memorandum decision granting Engle's motion for summary judgment. The district court explained:

8

"In cases for malicious prosecution, the inquiry as to want of probable cause is limited to the facts and circumstances as they appeared to defendant at the time the prosecution was commenced. [Citations omitted.] If the facts are undisputed, the question of probable cause is one for the court to decide as a matter of law. [Citation omitted.] Although it is the law that a voluntary dismissal of the prior action without prejudice may be a termination in favor of the person against whom that action was brought, this court does not find that the commencement of the civil action seeking an injunction or commencing suit for non compliance of a statute in this case was malicious in nature or with ill will based on an absence of probable cause. The court finds that [Engle] acted with probable cause[.]"

Huber moved to alter or amend the judgment because the district court had failed to address his contention that Engle elected "his remedies by choosing to proceed before the [KDWR] and therefore he was barred from filing a civil proceeding unless the [KDWR] denied [his permit] applications" because the Kansas Judicial Review Act (KJRA), K.S.A. 77-601, *et seq.*, "establishes the exclusive means of judicial review of agency action."

Engle responded to the motion by asserting the KJRA was not applicable because his lawsuit would not have required the district court to usurp the KDWR's administrative authority, as it "was not about whether a permit could/should be issued, it was about the fact that there was no permit for the work that was being done." Moreover, Engle pointed out that even if the KJRA were applicable, the KJRA does not prohibit district courts from issuing a restraining order while an administrative proceeding relating to the subject matter of the order remains pending.

On October 7, 2014, the district court issued a supplemental summary judgment order denying Huber's motion to alter or amend. The court explained:

"Although the [KJRA] under K.S.A. [2011 Supp.] 77-603 establishes exclusive means of judicial review of agency action, in this Court's view said mandate does not

9

apply to a third party not a party to the administrative application process. The statute contemplates the licensee being bound by the administrative procedures not a complaining party or third party. Further, this was an original action for an order of restraint to automatically terminate upon administrative compliance. The case law supports injunctive relief in this circumstance. *Johnson* [*Co.*] *Developmental Supports v. Kansas Dept. of SRS*, 42 Kan. App. 2d 570[, 216 P.3d 658] (2009)."

Huber timely appeals.

WAS THERE PROBABLE CAUSE TO INITIATE OR CONTINUE THE LAWSUIT?

On appeal, Huber contends the district court erred when it granted Engle's motion for summary judgment because Huber sufficiently satisfied his burden to produce evidence that Engle lacked probable cause to initiate and/or continue prosecuting his lawsuit against Huber. In particular, Huber argues:

"The district court erred in finding Harold Engle as a third party complainer was not bound by the pending administrative proceeding filed by Drew Huber's applications with the [KDWR] because he was not a party even though he participated in the application process by complaining.
. . . .
"Harold Engle elected his remedy by initially filing written complaints as to Drew Huber's applications with the [KDWR]. Harold Engle therefore lacked probable cause to sue in a civil proceeding for damages and a restraining order until the issuance of the permits had been determined."

Our standard of review for summary judgment proceedings is well settled:

"'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The [district] court is required to resolve all facts and inferences which

10

may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules[; if] reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 622, 345 P.3d 281 (2015).

Moreover, as in this case, where there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

To prevail on his malicious prosecution claim, Huber needed to prove: (1) Engle initiated, continued, or procured a lawsuit against him; (2) *Engle did so without probable cause*; (3) Engle acted with malice, *i.e.*, primarily for a purpose other than securing a proper adjudication of the allegations upon which he premised the lawsuit; (4) Engle's lawsuit terminated in his favor; and (5) he sustained damages. See *In re Landrith*, 280 Kan. 619, 647, 124 P.3d 467 (2005), *cert. denied* 549 U.S. 838 (2006); *Bergstrom v. Noah*, 266 Kan. 829, 836-37, 974 P.2d 520 (1999); *Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980); *Ball v. Credit Bureau Services, Inc.*, No. 111,144, 2015 WL 4366440, at *5 (Kan. App. 2015) (unpublished opinion). "[T]he elements of malicious prosecution are to be strictly construed to keep the cause of action from being wielded by wrongdoers as a threat to ward off legitimate suits." *Ball*, 2015 WL 4366440, at *8 (citing *Laing v. Shanberg,* 13 F. Supp. 2d 1186, 1188-89 [D. Kan. 1998]).

While the district court used broad language in defining the parameters of its summary judgment ruling, the court found that probable cause did exist for Engle to file and continue prosecuting the lawsuit and it did not consider whether Huber had established the remaining elements of malicious prosecution. As a result, the propriety of

11

the district court's probable cause determination is the only issue before us on appeal. See *Bartal v. Brower*, 268 Kan. 195, 201, 993 P.2d 629 (1999).

Huber and Engle dispute whether Engle had probable cause to initiate and/or continue prosecuting his lawsuit against Huber. Resolution of this issue on appeal requires an understanding of the meaning of probable cause in the context of malicious prosecution litigation. A brief summary of Kansas law follows.

"Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that the party committed the act of which he or she is complaining." *Bergstrom*, 266 Kan. at 837. This inquiry is limited to the facts and circumstances as they appeared to the initiator of the challenged lawsuit at the time he or she commenced the prosecution. If the validity of a claim is uncertain, the question is not whether the individual bringing the claim was correct in believing the claim would be meritorious; instead, the question is "whether that person's opinion that there was a sound chance that the claim might be sustained was a reasonable one." 266 Kan. at 837. A district court may decide whether probable cause existed as a matter of law when the relevant facts are undisputed, but if the facts are in dispute, it is the district court's duty to submit the question to the jury. 266 Kan. at 837.

Moreover, "[p]robable cause is not a static term in a malicious prosecution action"; therefore, "even if a person properly initiated a suit, that person could still be held liable for malicious prosecution for wrongfully continuing the suit when it became apparent that probable cause was lacking. [Citations omitted.]" *Miskew v. Hess*, 21 Kan. App. 2d 927, 933, 910 P.2d 223, *rev. denied* 259 Kan. 928 (1996). As in this case, a court may be tasked not only with determining whether probable cause existed to initiate the lawsuit, but whether probable cause continued to exist thereafter. See 21 Kan. App. 2d at 933.

12

*The Initiation of the Lawsuit*

Huber does not challenge the reasonableness of Engle's belief that his claims would be meritorious. Instead, Huber claims that because Engle participated in the chief engineer's determination of Huber's permit applications by acting as a third-party complainer, the KJRA prohibited him from seeking judicial review until a final order had been issued and he had properly exhausted his administrative remedies.

K.S.A. 2015 Supp. 24-126(a) makes it unlawful for any person to "construct, cause to be constructed, maintain or cause to be maintained, any levee or other such improvement on, along or near any stream of this state which is subject to floods, freshets or overflows, so as to control, regulate or otherwise change the flood waters of such stream" without "first obtaining the approval of plans for the same by the chief engineer of the [KDWR]," and private persons and governmental entities are liable for damages caused by the diversion of surface water from its natural course of flowage. See *Johnson v. Board of Pratt County Comm'rs*, 259 Kan. 305, 313, 913 P.2d 119 (1996); *Dougan v. Rossville Drainage Dist.*, 243 Kan. 315, 319, 757 P.2d 272 (1988); *Reeder v. Board of County Commissioners*, 193 Kan. 182, 185-87, 392 P.2d 888 (1964); *Horn v. Seeger*, 167 Kan. 532, 538-39, 207 P.2d 953 (1949); *Parker v. City of Atchison*, 58 Kan. 29, Syl. ¶ 1, 48 P. 631 (1897); *DeWerff v. Schartz,* 12 Kan. App. 2d 553, 556, 751 P.2d 1047 (1988); *Bower v. Cooseman*, No. 98,019, 2008 WL 2510579, at *6 (Kan. App. 2008) (unpublished opinion). Moreover, a separate line of Kansas caselaw has recognized that damming or altering the natural water flow may qualify as an actionable nuisance. *Dougan*, 243 Kan. at 319-20; see *Henderson v. Talbott*, 175 Kan. 615, 622, 266 P.2d 273 (1954).

One Kansas case provides helpful precedent. In *Simon v. Neises*, 193 Kan. 343, Syl. ¶ 2, 395 P.2d 308 (1964), our Supreme Court held that where a levee has been constructed without the permission of the KDWR, "an action to compel removal of levee

13

and restoration of land to former elevation and for damages sustained by its unlawful construction may be brought by [an] individual alleged to have been damaged by construction of levee."

In *Simon*, the plaintiffs sought a mandatory injunction to abate a levee as a nuisance and damages occasioned by its construction. The defendants did not have a permit from the KDWR to construct the levee; in fact, they had never filed an application for one. After the jury returned a general verdict in favor of the plaintiffs, the district court approved the verdict and found the

> "construction and maintenance of the levee by the defendants was unlawful . . . in that no approval of the plans for the construction of the levee was ever obtained from the chief engineer . . . as required by law, [and] that the maintenance of the levee constituted a continuing nuisance which should be abated." 193 Kan. at 345.

Accordingly, the district court issued an injunction against the defendants to abate and remove the levee at their expense. 193 Kan. at 345.

On appeal, the defendants contended, that G.S. 1961, 24-126 prohibited individual landowners from seeking a mandatory injunction to abate a levee because the statute provided this type of action may only be maintained by the attorney general. Similar to the current version of the statute, G.S. 1961, 24-126 provided:

> "'And in the event any such structure is about to be constructed, is constructed or maintained by any person, corporation, county, city, town, township or district without approval of plans by the chief engineer, it shall be the duty of the attorney general, to file suit in a court of competent jurisdiction, to enjoin the construction or maintenance of such structure.'" 193 Kan. at 346.

See K.S.A. 2015 Supp. 24-126(d).

Our Supreme Court disagreed with the defendants' interpretation of G.S. 1961, 24-126:

> "[T]he plaintiffs are not seeking an injunction because of alleged damage to any public property. The action is brought for the benefit of the plaintiffs alleged to have been damaged by the construction of the levee described in the petition. Such action may be brought by the individual or the party alleged to have been damaged, and the attorney general has no authority in the name of the state to assume the burden of conducting an action on behalf of private individuals. [Citations omitted.] The aforementioned statutes and our decisions clearly authorize a mandatory injunction action under facts such as in the instant case between owners of riparian agricultural lands to compel the removal of a levee unlawfully constructed and the restoration of the land to its former elevation, and for damages occasioned by its unlawful construction." 193 Kan. at 347-48.

Huber does not cite or address *Simon*. He argues the case the district court relied on, *Johnson Co. Developmental Supports v. Kansas Dept. of SRS*, 42 Kan. App. 2d 570, 216 P.3d 658 (2009), is distinguishable and that *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 249 P.3d 434 (2011), supports his assertion that Engle "elected his remedy" when he lodged complaints with the KDWR. As a result, Engle lacked probable cause to pursue a civil action because the administrative proceeding was still pending.

Huber is correct that *Johnson Co. Developmental Supports* does not bolster the district court's determination that "case law supports injunctive relief" under the circumstances present in this case. In *Johnson Co. Developmental Supports*, an administrative action was pending regarding whether Alberta Brumley had a known history of abuse, neglect, or exploitation of children or vulnerable adults that precluded her from obtaining affiliate status in order to become a paid provider of services for her disabled son. While the administrative action was pending, Johnson County

15

Developmental Supports (JCDS) threatened to terminate the affiliate status of the Resource Center for Independent Living (RCIL) if it did not discontinue payments to Brumley. Brumley, her husband, and son, subsequently filed suit in the Johnson County District Court seeking a temporary restraining order preventing JCDS from refusing payment to Alberta.

The district court issued the restraining order and ultimately granted an injunction against JCDS. But as Huber asserts, the issue on appeal did not involve the validity of the restraining order. Instead, the appellate court addressed the propriety of the district court's later decision affirming the Kansas Department of Social and Rehabilitation Services' final order requiring JCDS to affiliate with Alberta. 42 Kan. App. 2d at 577.

On the other hand, *Cochran* does not support Huber's argument. In *Cochran*, the City of Wichita (City) applied for permits to appropriate water for beneficial use by diverting groundwater. The Cochrans owned prior water appropriation rights in the vicinity of the City's proposed points of diversion; thus, during the permit process, the Cochrans informed the KDWR of their concerns that the City's appropriation would adversely affect their senior water rights. The KDWR, however, ultimately approved the City's permit applications. Following the issuance of the permits, the Cochrans requested an administrative hearing, but the KDWR denied their request, finding that under K.S.A. 82a-711(c), the applicant is the only party with standing to appeal a permit determination. The Secretary of the Department of Agriculture then denied the Cochrans' request for administrative review because "K.S.A. 82a-711(c) conferred standing to request judicial review of a permit only to the applicant for a permit and not to third parties." 291 Kan. at 901.

Subsequently, the Cochrans filed a petition for judicial review asserting the permits did not sufficiently protect their senior water rights, and they requested the "district court . . . stay or enjoin [the K]DWR's action under the permits pending the

16

Court's final decision; set aside or modify [the K]DWR's action; remand the matter for further proceedings before the [K]DWR with directions to protect the Cochrans' senior water rights; and provide other just and equitable relief." 291 Kan. at 901. The City and the KDWR challenged the Cochrans' standing to seek review of the chief engineer's order, and when the district court found that the Cochrans had standing, the City and the KDWR pursued an interlocutory appeal. 291 Kan. at 901.

Regarding the issue of whether the Cochrans had standing under the Kansas Water Appropriation Act (KWAA), K.S.A. 82a-701 *et seq.*, and the KJRA, our Supreme Court determined that although K.S.A. 2010 Supp. 82a-711(c) clearly limited standing for administrative review of adverse water permit determinations by the chief engineer to the applicant, the KJRA has a "much more inclusive provision regarding standing" because K.S.A. 77-611(b) grants standing to obtain judicial review of final or nonfinal agency actions to any "*person who was a party to the agency proceedings that led to the agency action.*" 291 Kan. at 905. The court then explained:

> "The KJRA defines 'party to agency proceedings,' as the term is used in K.S.A. 77-611(b), as '[a] person to whom the agency action is specifically directed' or 'a person named as a party to any agency proceeding or allowed to intervene *or participate as a party in the proceeding.*' [Citations omitted.]
>
> "The Cochrans have standing for judicial review under the KJRA if they participated as a party in the proceeding. In [*Board of Sumner County Comm'rs v.*] *Bremby*[, 286 Kan. 745, 189 P.3d 494 (2008)], this court considered this very question and determined that a 'party' was a person who takes part in a transaction. [Citation omitted.] Further, the court found that 'the legislature intended the term "proceeding" as it is used in the KJRA to be read broadly to refer to *the process* by which an agency carries out its statutory duties,' and the permit process [the Kansas Department of Health and Environment] undertook to consider whether to grant a landfill permit was a proceeding within the meaning of the KJRA. [Citation omitted.] This court held that an interested person's 'submission of written comments during a public notice and comment period and all persons' comments made during a public hearing held by an agency both qualify as

17

participation within the meaning of the KJRA's standing requirements.' [Citation omitted.]" 291 Kan. at 905.

Based on this definition, our Supreme Court determined the Cochrans had standing under the KJRA because they met the definition of a "party," as they owned prior appropriation rights in the vicinity of the authorized points of diversion for the City's permits and they participated in the permit application process by providing input to the KDWR regarding their concerns, which the chief engineer considered in rendering a decision. 291 Kan. at 906-07.

Despite Huber's assertion to the contrary, *Cochran* does not support his claim that the KJRA prohibited Engle from initiating "a civil proceeding for damages and a restraining order until the issuance of the permits had been determined" by the KDWR. In our view, *Cochran* simply indicates that although the KWAA only confers standing on water appropriation applicants, the KJRA confers standing upon "a party to the proceeding." *Cochran*, 291 Kan. at 907. Our Supreme Court has never indicated that by participating as a party to the agency proceeding, an individual, such as Engle, has "elected his [or her] remedy" and waived the right to pursue a civil action to protect an interest in land. See 291 Kan. at 907.

Moreover, assuming Engle obligated himself to act within the confines of the KJRA, the KJRA does not limit judicial review to a final agency action. The KJRA defines a final agency action as "(1) . . . the whole or a part of any agency action other than nonfinal agency action" and a nonfinal agency action as "(2) . . . the whole or a part of any agency determination, investigation, proceeding, hearing, conference or other process that the agency intends or is reasonably believed to intend to be preliminary, preparatory, procedural or intermediate with regard to subsequent agency action of that agency or another agency." K.S.A. 77-607(b). Generally, only final agency actions are subject to judicial review. K.S.A. 77-607(a). Under K.S.A. 77-608(a), however, a person

18

may take an interlocutory appeal of a *nonfinal* agency action if "[i]t appears likely that the person will qualify under K.S.A. 77-607 for judicial review of the related final agency action; and (b) postponement of judicial review would result in an inadequate remedy or irreparable harm disproportionate to the public benefit derived from postponement." A person qualifies for judicial review under K.S.A. 77-607(a) if he or she has (1) standing; (2) exhausted his or her administrative remedies; and (3) timely filed the petition.

While the parties do not discuss K.S.A. 77-608, Huber essentially concedes that Engle would qualify under K.S.A. 77-607 for judicial review of the KDWR's final agency action. Therefore, the question becomes whether the second prong of the test for bringing an interlocutory appeal from a nonfinal agency action, *i.e.*, postponement of judicial review would result in an inadequate remedy or irreparable harm disproportionate from the public benefit derived from postponement, is satisfied. See K.S.A. 77-608(b).

Based upon the facts alleged in Engle's petition, we find that he was fully entitled to pursue an interlocutory review, as Huber was constructing illegal levees without a permit in violation of K.S.A. 2015 Supp. 24-126, and according to Engle, the unauthorized levees were "seriously and irreparably changing the flow of the flood waters to [his] detriment." Under these circumstances, it was reasonable for Engle to seek a court order requiring Huber to cease and desist construction until the KDWR finished its review of his permit applications. Moreover, the public benefit derived from postponement was minimal because Engle's lawsuit did not interfere with the permit proceedings. As the district court found, Engle merely sought "an order of restraint to automatically terminate upon administrative compliance."

In summary, Engle's participation in the permit application process by lodging complaints with the KDWR regarding Huber's construction of illegal levees did not bar him from initiating a civil proceeding to protect his interest in adjoining land. At the time

19

Engle initiated his lawsuit there was probable cause that Huber was constructing levees without proper permits or at variance with the permits granted. As a result, a critical element of Huber's malicious prosecution claim was not proven.

*The Continuation of the Lawsuit*

Alternatively, Huber argues that the KDWR's December 13, 2010, letter, which instructed him not to perform any more work on the levees pending the approval of his applications, and/or the granting of his permit applications in March 2012, annulled any probable cause Engle may have had for initiating a lawsuit. According to Huber, Engle's decision to wait until July 2, 2012, to file his motion to dismiss qualifies as a separate claim of malicious prosecution because Engle has not "set forth any rational basis for the delay."

We are not persuaded this argument has merit. The December 13, 2010, letter confirms that Huber had been constructing levees without a permit, and while Byrd indicated that "[n]o further work *should* be performed" without KDWR approval, this instruction does not negate Engle's probable cause to believe Huber would continue to act in derogation of K.S.A. 2015 Supp. 24-126 if the court's restraining order were lifted. (Emphasis added.) Likewise, with respect to the KDWR's approval of Huber's permit applications, the KDWR approved a plan revision on April 3, 2012, which indicates that the matter was not yet settled when the permits were issued.

Accordingly, Engle's decision to wait about 90 days to seek a voluntary dismissal does not seem unreasonable because Engle needed time to review the KDWR's documentation regarding the scope of the permits and to determine whether Huber was going to comply with the approved plans. Moreover, as Engle points out, "Huber was not harmed during that period of time, because the restraining order only applied to non

20

approved structures, once the structure was approved, the lawsuit restraining order did not affect [his] ability to build approved structures."

In conclusion, we find the district court did not err when it granted Engle's motion for summary judgment because Huber did not establish a prima facie claim for malicious prosecution. Despite Huber's assertion to the contrary, Engle had probable cause to initiate and continue prosecuting a lawsuit against him because Engle had a reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent person in the belief that Huber committed the act of which he was complaining, *i.e.*, Huber was illegally constructing levees along the Verdigris River, which threatened to irreparably harm Engle's interest in adjoining land.

Affirmed.